WALTER N. KELLEY CO. *v.* ANDREWS.

1. TROVER AND CONVERSION—DAMAGES—WAIVER—LOGS AND LOGGING.

> Where plaintiff knew that part of the lumber sold to it and paid for had been sold by defendant to another, and other lumber afterwards sawed substituted therefor, its action in ordering defendant to ship the substituted lumber without raising the question of damages for said conversion amounted to a waiver thereof, notwithstanding plaintiff's manager, when first informed of the conversion, strongly objected thereto, and informed defendant's agent that he would not waive any legal rights by consenting to the sawing and piling of the substituted lumber.

2. APPEAL AND ERROR—BREACH OF CONTRACT—WAIVER—APPELLANT MAY NOT COMPLAIN OF FAVORABLE INSTRUCTIONS.

> Where it is conceded that lumber furnished did not come up to the specifications in the contract, but defendant claims that plaintiff waived its claim for damages in regard thereto, defendant may not complain of the submission of the question to the jury because, although there was evidence of waiver on that shipped prior to June 1,

1921, which would carry the question to the jury, there was no waiver on that shipped subsequent to that date.

3. LOGS AND LOGGING—LUMBER INSPECTION MUTUALLY AGREED UPON CONCLUSIVE IN ABSENCE OF FRAUD OR MISTAKE.

Since the purpose of agreeing on an inspector of lumber is to prevent disputes arising after shipment, the results of an inspection by an inspector mutually agreed upon, in the absence of fraud or mistake, is conclusive between the parties.

4. SAME—DAMAGES FOR FAULTY INSPECTION NOT ALLOWABLE IN ABSENCE OF SUPPORTING EVIDENCE.

Where it was agreed that the rules of the National Hardwood Lumber Association were to govern in the inspection of the lumber, and the inspector testified that said rules were followed, the trial court was in error in allowing the jury to assess damages for failure to follow said rules, in the absence of proof that said rules, or rules which should be followed by a competent inspector in case the rules contained no governing provision, were not followed.

Error to Delta; Flannigan (Richard C.), J. Submitted October 5, 1923. (Docket No. 38.) Decided December 19, 1923.

Assumpsit by the Walter N. Kelley Company against James R. Andrews for conversion and for breach of a contract for the sale of lumber. Judgment for plaintiff. Defendant brings error. Reversed.

*S. M. Matthews* and *G. R. Empson,* for appellant.

*Ryall & Frost,* for appellee.

SHARPE, J. The plaintiff and defendant entered into the following contract on October 18, 1919:

"MEMORANDUM OF SALE.

"This memorandum of agreement by and between James R. Andrews, of Escanaba, Michigan, and the Walter N. Kelley Company, of Detroit, Michigan, whereby the Walter N. Kelley Company, of Detroit, Mich., has the option of purchasing the following

stocks of lumber to be manufactured and put in pile at the mill of James R. Andrews, at Talbot, Michigan:

"MANUFACTURE: The following quantities of stocks to be sawn from January 1, 1920, and on, at the rate of 250,000' per month, until the following quantities are all in pile. Stock to be all in pile not later than April 1, 1920.

"Hard Maple.

"QUANTITY:
200,000'   4-4 No. 1 Com & Better, 6" & up
500,000'   8-4 No. 1 Com & Better, 6" & up
300,000'  10-4 No. 1 Com & Better, 6" & up

"Above thicknesses to run 50% 1st & 2nds to grade.

"PRICES as follows:

1st and 2nds No. 1 Common
4-4 $70.00..$55.00
8-4   80.00.. 65.00
10-4  90.00.. 80.00    $60.00 for 10% No. 2

"These prices are f. o. b. cars Talbot, Mich., rough.

"TERMS: Advance is to be made of $40.00 per M' between the 5th and 10th of each month, for all stock placed in pile the preceding month—then when stock is shipped, 2% discount off for cash, 10 days from shipment, to be deducted on all invoices, also the advance of $40.00 per M' to be allowed against the account.

"INSPECTION: Gunderman & Symons, of Escanaba, to measure and inspect. National Hardwood Lumber Association rules to govern, each party to pay one-half their fees.

"SHIPMENT: All lumber to be shipped within 90 days after the lumber all goes in pile. This will be based on the estimate taken for each month in settling for the advance.

"OPTION: It is understood and agreed that if this contract is signed and returned to the office, of James R. Andrews, Escanaba, Mich., by October 28th, 1919, the same will be valid and in operation. If it is not, then this contract becomes null and void; Walter N. Kelley is to return the contract at once.

"JAMES R. ANDREWS,
"Per James R. Andrews.

"Accepted:
"WALTER N. KELLEY COMPANY,
"By Walter N. Kelley, Pres."

Defendant proceeded to saw the lumber and plaintiff to make the advances provided for. Certain shipments were made and settled for. On June 25, 1920, defendant wrote plaintiff, inclosing a statement of the lumber in pile and advances made, and asked for remittance of $7,100, the balance shown to be due. To this, plaintiff replied on the 26th, inclosing a check for the amount, and further stating:

"As you mentioned to the writer that you were needing funds at this time, which we are a little surprised at as we supposed you had reached the peak and would have no use for any additional money, but as long as you do, we have a proposition that might work out to our mutual advantage.

"On account of our being held up on some of our orders at the present time, we will give you our four months note for the balance that the lumber will amount to and we could estimate the price based on the inspection of what stock has been shipped. This four months note, we to pay interest upon and not take a cash discount on the lumber and by our settling for the lumber in full at this time, it is to be understood that we are to ship the lumber out from time to time at our convenience. This would place us in a position where we would not be forced to go out and sell the lumber to someone else at the present time but can hold it until our customers are in shape to take it in."

Defendant accepted this proposal on the 28th in a letter concluding as follows:

"Whatever balance there may be at completion of shipping, can be adjusted."

Plaintiff replied to this on July 1st, inclosing notes for $15,000—

"with the understanding that you are to hold this lumber and ship it upon our orders from time to time as we can get our customers to take the stock in."

The piles of lumber were marked "WNK," indicating that they contained the lumber which had been

sawed for plaintiff under the contract. During October and November following, defendant shipped to other parties 232,000 feet of this lumber, for which he received a price in excess of that provided for in the contract. Later, defendant's representative, A. L. McBean, saw Mr. Kelley at his office in Detroit and informed him of such shipment. As to what was then said, Mr. Kelley testified:

"They wanted to substitute new cut stock for it. He proposed to substitute new cut stock for this lumber they had shipped out, that I had paid for. * * * I told him I was very much surprised that Mr. Andrews would assume to ship out lumber we had bought and paid for, and supposed we had in dry piles, dry stock, to supply our trade in the spring; and that so far as the lumber which had been shipped out that belonged to us, I absolutely would not accept new cut stock; but what they could do, if they would go ahead and put the new cut stock in piles, that when the time came that I wanted it, I then would decide as to what I would do; and I absolutely would not waive any legal rights we might have in connection with the transaction.

"Mr. McBean accepted this proposition and assured me the stock would be put in piles as strictly according to grades and qualities covered by the contract."

John W. Swain, an employee of plaintiff, was present at this conversation. He testified:

"Q. Do you remember what Mr. Kelley said when he was so informed?

"A. As I remember, he told Mr. Kelley—or Mr. Kelley told Mr. McBean in the event that the lumber which they proposed to furnish was of equal character and grade, it would be satisfactory.

"Q. Did he say anything at that time to the effect that he would not waive any of his legal rights in respect to the matter?

"A. Yes, sir."

Mr. McBean testified:

"He (Kelley) was very mad when I told him, and I talked the thing over, and at last, after I told him

that we would furnish him the balance of the 8-4, which was the 230,000 feet out of the new cut logs in the spring, he said that would be all right.

"*Q.* Do you remember whether he put it just that way? Did you hear him testify this morning?

"*A.* Well, I told him we would ship him the lumber; and he said he wouldn't waive any of his legal rights in the contract.

"*Q.* Whether or not he said he would wait and see what kind of stock those logs produced?

"*A.* Yes, sir."

Lumber was shipped to plaintiff to replace this 232,000 feet between June 1st and August 8, 1921.

1. The plaintiff claims damages for a conversion of this lumber. The trial court instructed the jury:

"We are dealing with the question of the 232,000 feet shipped out. The claim of the defendant is that the plaintiff agreed to accept lumber which the defendant would subsequently ship, in settlement of all his claims because of the conversion I have mentioned and because of the failure of the defendant to ship on demand. The plaintiff, on the other hand, denies that he made any such agreement. He claims that he reserved, in the talk with the witness who represented the defendant, that he at all times reserved his legal rights because of the conduct of the defendant respecting this 232,000 feet. Now what is the fact there, gentlemen? You must settle that from the evidence in the case.

"If you find that the plaintiff did agree to accept this lumber in settlement of all his legal rights for damages because of the conversion, or failure to deliver the 232,000 feet, then you will allow him nothing for such conversion or failure to deliver. But unless you so find, then you will take up the question of what he is entitled to, bearing in mind the instructions you have already received as to the measure of damages for the conversion and failure to deliver any portion of the 232,000 feet."

We have set forth the testimony of the three witnesses present when the conversation was had. All are agreed that Kelley said he "would not waive any

legal rights we might have in connection with the transaction." Kelley further testified that he said they could *"go ahead and put the new cut stock in piles, that when the time came that I wanted it, I then would decide as to what I would do."* The testimony of the other two more strongly supports defendant's claim, that the conversion was waived by the acceptance of the lumber afterwards sawed and delivered. The title to the 232,000 feet had passed to plaintiff. Its sale by defendant was a conversion, for which plaintiff might recover. His announcement that he "would not waive any legal right" is of no force if what he then said and afterwards did amounted in law to a waiver of his legal rights. He told McBean that defendant might go on and saw other lumber and when the time for shipment came he would decide as to what he would do. It seems to be undisputed that he ordered the newly-cut lumber shipped and made no suggestion to defendant that he was not accepting it in full satisfaction of his claim for the lumber converted. There was a time when he should have spoken. That was when he ordered the lumber shipped. Had he then informed defendant that he would not accept this lumber in lieu of that converted, it would have been up to defendant to decide whether he would ship it or not. He could have refused without violating any contract rights. He would, of course, have been liable for the lumber he had converted, but he was under no obligation to ship the newly-cut lumber to plaintiff and then have plaintiff make the claim for damages for conversion now made by him. Under the arrangement made with McBean it was plaintiff's duty to "decide" as to what he would do before he ordered the lumber shipped. Its letters and shipment orders clearly indicate its intention to waive its claim for conversion. On February 10th, several months after plaintiff had been informed of the conversion, defend-

ant wrote plaintiff, insisting on shipping directions for the newly-cut lumber to relieve his piling space. To this, plaintiff replied on February 12th:

"We are in receipt of your letter of the 10th with reference to lumber which we have paid for at your mill. We will do everything we possibly can to move this stock, but at the present time, it is impossible for us to give you shipping instructions, as we haven't a place to put the lumber and the railroad will not allow us to let it stand on their siding."

The order for shipment of this lumber, dated May 25, 1921, was for 232,130 feet 8-4 hard maple, "To apply on our purchase 10-18-19." The letter accompanying same, signed by Mr. Kelley personally, read.

"We are enclosing herewith formal shipping order for 232,130 ft. 8-4 Hard Maple which is the balance of the stock due on our Purchase 10-18-19. Be sure and do not ship faster than 50 M ft. per week, and this lumber must be loaded in accordance with our contract, 6" & up wide, and not less than 50% FAS."

No more expressive language could have been used to indicate that the shipment of this lumber was to be in fulfillment of the original contract, and was to be accepted in lieu of that converted by defendant. On the receipt of invoices for two cars shipped under this order, plaintiff wrote defendant on June 6th:

"Now, we purchased this lumber from you 6" & up wide with not less than 50% FAS and we must insist upon the lumber being shipped in the percentage of FAS according to contract."

On June 28, 1921, defendant writes that he has shipped 970,655 feet on the contract, leaving but 29,345 feet yet to ship, and that against the latter "you have a credit on my books of $1,218.38," and asking for a further payment of $900. Testifying concerning this letter, Mr. Kelley said:

"The figure mentioned therein of $1,218.38 was correct. I don't know what the reason was for ask-

ing an additional $900. The $1,200 credited me plus $900 was the estimated amount for the 29,000 feet still due to make up the million feet."

On July 5th, defendant again writes, asking for shipping directions for the balance. To this letter plaintiff replies, saying shipping directions have been furnished him. On July 12th, plaintiff writes:

"We wish you would make a special effort to ship the balance of the 8-4 Maple upon our order No. 4077 without further delay."

(The order 4077 was for the newly-cut lumber to be shipped to Horner at Reed City.) To this defendant replied on the 14th, refusing to ship until payment was made as requested in his letter of June 28th. Plaintiff concluded his answer to this letter by saying:

"As soon as all the lumber is shipped we will pay you whatever we owe."

Plaintiff in the meantime had been making repeated complaint that the lumber was "not holding up to the percentages of FAS that the contract calls for," but we find no intimation in any of his letters that the shipment to be made to Horner was not to be in full satisfaction of the claim he had against defendant for conversion of the 232,000 feet of lumber in the fall of 1920.

Defendant was legally liable to plaintiff for the 232,000 feet of lumber which he converted to his own use in the fall of 1920. Plaintiff could have sued and recovered his damages incident thereto. He chose, however, to waive his right to recover damages and accept other lumber in lieu of that converted. This he had a right to do, and, having done so, he may not afterwards make claim to such damages. The jury should have been so instructed. In *Dow Chemical Co.* v. *Chemical Works*, 208 Mich. 157, 172 (14 A. L. R. 1200), it is said:

"Waiver implies the abandonment of a right by a person entitled to exercise it, who has at the time full knowledge of the existence of the fact on which the right depends.    Such knowledge and the intention to relinquish the right must concur.    The facts relied on must also show that such intent was communicated to and so understood by the party claiming the waiver. It is, in effect, the abandonment of a particular obligation and an agreement to substitute another in its stead."

2. In its declaration and bill of particulars, plaintiff claimed damages for defendant's failure to ship as large a percentage of firsts and seconds as was provided for in the contract.    The fact was conceded. It was defendant's claim that plaintiff, by its acceptance of the lumber shipped prior to June 28, 1920, when it was agreed that the undelivered balance might remain in defendant's yard, had waived any claim he might have, based on the quality of the lumber shipped. The correspondence clearly shows that plaintiff was continually finding fault because the shipments did not contain the percentages of firsts and seconds contracted for.    There is evidence that defendant insisted on shipping the lumber as it ran in the piles, irrespective of its grade.    Plaintiff's purchase was 1,000,000 of lumber, of which 50 per cent. was to be firsts and seconds.    The shipments made did not average 30 per cent.    While the contract was necessarily severable so far as the delivery of the lumber was concerned, performance by defendant required that the entire shipment should contain the percentage of firsts and seconds contracted for.    It is clear that there was no waiver of this provision as to the lumber shipped after June 1, 1921.    Whether there was as to that shipped prior thereto was, we think, a question for the jury, and was properly submitted to them.    In defendant's letter to plaintiff of July 18, 1921, he sought to obtain an admission that the quality of the lumber shipped had been satisfactory.    This is sug-

gestive, at least, that he feared a claim would be made, such as plaintiff now seeks to recover for.

3. Error is assigned upon the following instruction:

"The second claim of the plaintiff is that ten per cent. of all the lumber shipped by the defendant to Detroit and to Reed City was rotten, dozy and inferior, and that he was damaged in consequence to the extent of $2,938.38.

"Now there was an implied warranty that this lumber would be merchantable. The parties agreed upon an inspection, and also agreed upon an inspector. Substitution was made for the inspector named in the contract. This substitution was made by mutual consent. The inspection was made by Mr. Coeman, by consent of both parties. If the inspector took these matters into account under the rules of the National Hardwood Lumbermen's Association, then this inspection was binding upon both parties. Understand me. In making this inspection if he was required by the rules of the Hardwood Association mentioned, introduced in evidence and presented here, if he was required by those rules and did take into account the rotten, dozy and inferior nature of the lumber, then his inspection was binding upon both sides. But if he was not required by these rules to take into consideration whether the lumber was rotten, dozy or inferior, and did not do so, then his inspection is not binding upon the plaintiff in this case."

In the contract, a firm of inspectors was agreed upon. A change by mutual consent was afterwards made. The National Hardwood Lumber Association rules were to govern. The plaintiff produced in court a number of pieces of boards, in part dozy or rotten, testified to as having been taken from shipments made by defendant to plaintiff in the summer of 1921. He testified that ten per cent. of the lumber then shipped was in that condition. John S. Coeman, the inspector agreed upon, on being shown some of these pieces, testified:

"If this board would grade as a first and second, that is the balance of it, and the trimmer in the mill,

as the log went through into boards failed to cut off a piece of that kind, it would carry it down from a first and second into No. 1 common or possibly select. It would lower it one grade.    When that board was inspected as it went on board the car, it would be inspected as a select, or No. 1 common, if it took a lower grade.    The same thing would be true in regard to the dozy pieces."

He further testified:

"All this lumber that was shipped under this contract was inspected according to the National Hardwood Lumbermen's Association rules, which are standard rules in the trade."

R. B. Hill, an employee of Coeman, who did the inspecting, testified:

"Whether or not I would have passed the board in the condition in which this one is, marked with the car number 30504, depends on what the balance of the board was.    That might have been a 16-foot board, and just a couple of feet like that, and the other fourteen feet might have been absolutely clear.    There is no question but what I might pass a board with that piece of decay if it was on the end.    I call that rot. It is not dote.    *    *    *

"Q.    *    *    *    Would you have passed it as containing the number of board feet in the log as a board of that dimension would have contained, so far as the quantity, the number of feet?

"A. Well, the National Hardwood Lumbermen's Association rules govern that.

"Q. What is that?

"A. You are not to trim it, with that rule.    In other words, I give the full quantity measurement. That is the method of inspection under those rules. Supposing in a board twenty-five feet, if a board had twenty-five feet of the lumber in it, 66% of it clear, I would treat it as twenty-five feet, although part of it was in that condition, and that is in accordance with those rules."

He further testified: "The lumber was correctly inspected and graded."

A pamphlet copy of the rules of the association had

been theretofore offered in evidence.  We do not find that the attention of either of these witnesses was called to any rule relating to inspection which showed, or tended to show, that the method pursued was not in accordance therewith.  The purpose of agreeing on an inspector is to prevent disputes arising after shipment.  In the absence of fraud or mistake, the result of the inspection made by a man agreed upon is conclusive between the parties.  *Peterson* v. *Reichel,* 143 Mich. 212; *Brooks* v. *Bellows,* 179 Mich. 421. The instruction given so stated, but submitted to the jury the question whether the inspector in his work had followed the rules of the association.  We have read the rules with care.  Both Mr. Coeman and Mr. Hill testified that these rules were followed, and that the lumber was properly inspected and graded in conformity therewith.  Counsel did not call the attention of the trial court, nor do they call our attention, to any rule providing for a different method of ascertaining the quantity of lumber in a board, a part of which is dozy or rotten, from that pursued by the inspector. He made allowance for it by reducing the grade.  We do not think the jury, in the absence of proof that the rules of the association, or the rule which should be followed by a competent inspector, in case the rules contained no governing provision, required a different method, should have been permitted to find that the inspection made was unfair to plaintiff and to assess damages to him by reason thereof.  It does not appear that any other inspection of the lumber was had. Plaintiff's claim simply rests on his estimate of the loss and damage made by him.

For the errors pointed out, the judgment will be reversed, with costs to appellant, and a new trial ordered.

WIEST, C. J., and FELLOWS, McDONALD, CLARK, BIRD, MOORE, and STEERE, JJ., concurred.