STROM-JOHNSON CONSTRUCTION CO. *v.* RIVERVIEW FURNITURE STORE.

1. MECHANICS' LIENS—LIQUIDATED DAMAGES—WAIVER—ESTOPPEL. In a suit for the enforcement of a mechanic's lien, defendant, by failing to provide space and water for plaintiff's operations, as provided in the contract, and by ordering extra work which was necessarily carried on in connection with the original contract and which rendered its performance within the time limit impossible, *held*, to have waived the time clause in the contract, and therefore is estopped from claiming liquidated damages for delay as therein provided for.

2. SAME—COMPLIANCE WITH CONTRACT.
    Defendant's claim that the work was not performed by
    plaintiff according to the requirements of the contract,
    *held*, negatived by the certificate of the architect to the
    contrary, and also by the great weight of the testimony.

Appeal from Kent; Perkins (Willis B.), J.    Submitted October 18, 1923.    (Docket No. 43.)    Decided May 8, 1924.

Bill by the Strom-Johnson Construction Company against the Riverview Furniture Store to foreclose a mechanic's lien.    From a decree for plaintiff, defendant appeals.    Affirmed.

*Roman F. Glocheski*, for plaintiff.

*John J. Smolenski* (*Henry E. Chase*, of counsel), for defendant.

STEERE, J.    Both parties to this litigation are corporations organized and doing business under the laws of this State.    Plaintiff's business is chiefly construction of large buildings such as stores, school houses, factories, etc.    Defendant owned and operated a furniture store in the city of Grand Rapids.    On April 27, 1921, plaintiff entered into a contract with defendant to remodel and add a story to its store building, located on west Bridge street, in said city. Defendant employed an architect and an elaborate building contract with plans and specifications, made a part thereof, was prepared and signed by the parties. The time specified for performance of the contract was until August 1, 1921.    The consideration named in the contract was $27,933.    Various extras were added during the progress of the work amounting to $5,006.75, which made a total indebtedness for full performance with extras added $32,939.75.    Payments were made by defendant on architect's certificates before completion of the work to the amount

of $28,560.31, leaving a balance of $4,379.44.   Defendant was authorized to withhold 15 per cent. until completion of the contract for its protection and declined to make this final payment, claiming damages on various grounds, and particularly for delay in completing the contract.   Plaintiff then filed a builder's lien followed by this bill to foreclose the lien and enforce payment.   The contract contained a clause providing as liquidated damages $25 for each day the contractor extended the work beyond the time prescribed for completing the contract.   Defendant claims credit for that amount per day from August 1st to November 17, 1921, less one week's extension of time for completion granted by the architect, or for 101 days at $25 per day, amounting to $2,525.

Plaintiff's claim is in effect estoppel by waiver; that the delay was caused through the fault of defendant in requiring a large amount of extra work, in not clearing the rear of the premises as agreed in time for plaintiff to commence performance on May 1, 1921, delay in providing promised water service until May 24th, failure to have the work of auxiliary contractors, hired and controlled by defendant to install wiring, plumbing, elevator, etc., performed in time and manner as agreed and required for the work to proceed without delay.

During the entire time this contract was being performed defendant occupied and daily ran its store, in which it regularly conducted its retail furniture business, as soon as available using the additions and conveniences plaintiff had constructed.   The contract was substantially completed on September 17, 1921, with the defendant in occupation and use of its additions when it held an advertised grand opening. But some work was done by plaintiff in completion of its undertaking according to certificate of the architect in charge as late as November 17th.   Thirty

days thereafter he gave defendant the following cer-
tificate, and sent plaintiff a copy:

"Dec. 17, 1921.

"Riverview Furniture Store,
    "City.
    "*Gentlemen:* This is to certify that the Strom-
Johnson Construction Co. having satisfactorily com-
pleted the work under their contracts for the erection
of the addition to your building on West Bridge
street, thirty days ago, are, by the terms of the agree-
ment, entitled to the final payment of four thousand
three hundred and seventy-nine and 44/100 dollars
($4,379.44) which was retained as permitted by the
agreement for thirty days subsequent to such com-
pletion.     See statement of November 17th for this
amount.

"Yours very truly,
    "Robinson & Campau, Architects,
    "By Fred S. Robinson."

It was the opinion of the trial court that plaintiff's
failure to complete the contract within the specified
time was the fault of defendant and a decree was
granted plaintiff for the balance of $4,379.44, with
lien declared and foreclosure ordered as in such cases
provided.

For the contract signed by the parties the standard
form of the American Institute of Architects appears
to have been used, with its numerous headings and
"articles."     Under the heading "General Conditions
of the Contract" are some 45 articles dealing with a
variety of contingencies and elements of the contract
such as "Principle and Definitions," the "Architect's
Status," "Architect's Decisions," "Materials, Appli-
ances and Employees," "Deductions for Uncorrected
Work," "Changes in the Work," "Claims for Extras,"
"Certificates and Payments," "Delays," "Separate Con-
tracts," etc.     Sub-paragraph "f" of article 1 provides:
"All time limits stated in the contract documents are
of the essence of the contract."     Under article 9,
dealing with the "Architect's Status," he is said to

have general supervision and direction of the work as agent of the owner to the extent provided in the contract documents, with "authority to stop the work whenever it may be necessary to insure the proper execution of the contract," and by article 10 he is authorized to make decisions within reasonable time "on all claims of the owner or contractor and on all other matters relating to the execution and progress of the work or the interpretation of the contract documents," all his decisions being made, however, subject to arbitration.

The Riverview Furniture Store was organized by Valentine J. Banaszak, who for a time personally owned and ran a furniture store where the building in question is located and then incorporated the business, becoming its president and manager. He was defendant's principal witness, and was at the building representing it while the contract was being performed under supervision of defendant's architect, with whom he states he mostly talked about matters relating to the improvements in progress and "let the architect handle it," and "generally transacted the deal" through him, communicating with plaintiff mostly through that channel. At the time this work was done a clothing department had been added to defendant's merchandising business. He testified that the entire building had a frontage of 82 feet, the portion occupied by the clothing department being 65 feet deep and the other part 118 feet deep.

The contract itself required plaintiff to furnish the material and perform the work shown on the drawings and described in the specifications, which were entitled:

"Specifications for general contract for additions and alterations to the plant of Riverview Furniture Co., 279-281 Bridge St., N. W., Grand Rapids, Mich., modified by addenda issued under dates of April 24 and 25, 1921, copies of which are attached hereto," etc.

Counsel evidently agreed that it was unnecessary to embody the voluminous specifications and drawings in the record in full, and it only contains certain "excerpts from the specifications for general contract for additions and alterations" said to relate to the issues involved. From them it appears that the contract did not include "the heating, electric wiring, plumbing, interior decorating, elevators, or any furnishings." For these defendant let independent contracts to various parties who were working on their contracts contemporaneously with performance of plaintiff's contract. For performance of plaintiff's contract it was provided that:

"General plan of operation shall be to erect the basement and first story of the addition at the rear, then to carry up three more stories over the entire plant, putting on the roof, then to remove the old roof and proceed with the interior work of the upper stories and rear after which the work in the first story and basement of the old building shall be done."

Provision was made for continuance of defendant's business in the building "as nearly as possible without interruption," and to that end plaintiff was required to erect at the front of the building a substantial and safe platform with a "neat appearance" covering the entire width of the sidewalk and bring in all material at the rear, from where it was to be placed on vacant property north of the building which defendant would provide. Plaintiff was required to furnish ladders or other suitable means at the rear so that its workmen could reach the upper portion of the building without passing through it, and it was "understood that the employees of the contractor are not to enter the present building except to do necessary work therein." When the time arrived for making the alterations in the first story and basement it was to be done with the least inconvenience to the owner,

"arrangements being made with the owner by the contractor regarding the same."

According to plaintiff's testimony it was prepared to begin performance of its written contract promptly on May 1st and did so but was hampered from the start by failure of defendant to provide storage room for material at the rear and water for the work as agreed, so that operations could not be efficiently carried forward until water service was provided on May 24th, and after that it was repeatedly delayed by failure of defendant's independent contractors to do their contemporaneous work in proper time, as well as by repeated requests for additional work on the building outside the terms of the contract, which plaintiff did whenever directed, much of it so associated with the work of the original contract that it necessarily preceded or was contemporaneous with it. Two comparatively large jobs requested and performed as extra contracts consisted of putting in an entire new store front and a balcony over it at the second floor. For these plaintiff furnished defendant estimates amounting to $3,207, which are not disputed.

So far as shown the contracts for all of these additional jobs were oral. Aside from the new store front and balcony not even estimates were furnished for the extra jobs. As Banaszak concluded he wanted those things done he gave orders to that effect to his architect, who was overseeing the work from day to day, and the latter communicated them to plaintiff. The agreements for the store front and gallery were not made until the latter part of July. Plaintiff's secretary, Johnson, stated its contention in part as follows:

"There would have been no difficulty in completing the contract as originally planned by the first of August if we could have started as originally intended on May 1st, and had not been delayed by the plumbers and gas fitters and electricians, as we put a force of

men on Decoration Day and Sundays, in order to hurry the thing along. * * * No one ever complained to me that the work was not finished on time while we were on the job."

The week extension of time granted in writing by the architect related to a change in specifications of the original contract requiring additional time and material to reinforce the second story floor construction which was found to be weak and inadequate. The many additional jobs which followed as Banaszak called for them were ordered by the architect and done by plaintiff as directed without any reference being made by either party as to time requirements of the contract, as plaintiff's evidence showed, except on one occasion testified to by Mr. Qualman, the builder in charge for plaintiff, who stated on that occasion he talked about it with Banaszak and the latter said: "If I can get in here and have my opening on the 17th of September, I am satisfied," and he did have his grand opening on that date. While the improvements, including extras, were not all completed until later, no work was done around there by plaintiff on that day in compliance with Banaszak's request, and the latter, when asked "What was not finished that interfered with your grand opening?" replied: "Well, I say I couldn't just say what was not finished. There was a lot of other things that was not done, * * * but I couldn't say what was not finished, my memory would not recollect that." He did recollect when his attention was called to it, that beyond what the original contract provided for he had ordered through the architect construction of the new store front and balcony, a factory room, changes in five outside windows, work done on the lamp shade cabinet and tailor shop, a concrete driveway, the erection of glass partitions in the office, a hat-rack built on the second floor, and a work-room and partition in the basement, while he claimed that

other extras shown by plaintiff's testimony were included in the contract.   Much of this extra work was ordered and done after the time limit of August 1st specified in the original contract had expired.   During the time these additions and alterations to the building were in progress and Banaszak was ordering extras which prolonged performance of the original contract, not only was defendant's business regularly carried on there but he featured the situation by frequently advertising alteration sales in both the English press and local Polish publications.   On November 23, 1921, he paid plaintiff $4,461.42 on presentation to him of the architect's certificate for that amount.   Mr. Strom, representing plaintiff, presented the certificate and received the payment.   He testified that they had some talk at that time relative to further payments which, so far as applicable here, he related as follows:

"I told Mr. Banaszak that in 30 days I would be back and expect to get the balance due us, and Mr. Banaszak, he says all right, we have some papers or figures that do not correspond, which you are entitled to have, and everything seems to be all right, some error made by the architect in figuring the 15 per cent.   Mr. Banaszak did not complain to me at that time about the work.   Mr. Banaszak seemed to be very friendly at that time."

Asked about this Mr. Banaszak said:

"I didn't transact the business with Mr. Strom.   I didn't know who he was.   I only knew Mr. Qualman and Mr. Johnson.

"Q. You didn't know who Mr. Strom was when he came there November 17 for $4,461?

"A. I did after he explained himself.

"Q. Didn't he call you up at that time on the telephone and tell you he was coming after that check?

"A. Yes, Mr. Johnson told me who he was.

"Q. And why didn't you tell him the work was not completed?

"A. I told you I did not talk to Mr. Johnson; I transacted all the details through the architect.

"*Q*. And you never at no time told the Strom-Johnson Construction Company, either Mr. Strom or Mr. Johnson, that the work was not completed as per contract, did you?

"*A*. Not to my knowledge."

Charles Johnson, a representative of the construction company, testified that there was no unfinished work under the original contract in the store proper when defendant had its grand opening in September, and all the work including extras ordered was completed, except a few little things here and there which the architect directed, some time before they received their final statement which was allowed to wait for the steam fitter to finish at request of the architect who said, "I wish you would let this rest until the steam fitter gets his in and gets done."

When Johnson received the architect's final certificate he presented it to Banaszak for payment, who made no objection to it but who said they could not then borrow any more money and asked if they would accept notes. This was declined, and not until later, when Johnson offered to take notes for a limited time, did Banaszak intimate that the balance shown by the certificate was disputed, and then "gave no reason why he could not pay, only he had no money." Banaszak, after denying talking with Johnson, replied, when first questioned about this interview, "I don't remember," but, on his memory being refreshed, said, "I told him I just got notice from the architect and I have to call the board of directors together as always, and the secretary is out of town and I can't say if I can call them together right off or not, but as soon as they come together I would let him know."

Along this line of thought it is urged in defendant's behalf that its president

"could not by any act of his waive or extend the time for completion of the work beyond August 1, 1921, or waive or modify any condition of this contract,

which was entered into and executed by defendant corporation, * * * And the burden of proof is upon plaintiff to establish that Mr. Banaszak had such power, before it can show any waivers or modifications of this contract by him."

Assuming that to be the general rule, corporations can only act through their agents and officers, and we find here an unquestioned contract entered into by defendant, officially signed for it by Banaszak, who was its president and general manager in charge of its business and building where and while the contract for its improvement was being performed.   He was there as defendant's agent and manager in charge, representing its interests.   As such he dealt with and directed plaintiff in performing its contract through, as he testified, defendant's architect who was supervising the work.   Beyond the authority inferable from such a situation, he stated in substance that he "always" called the board of directors together for authority to act.   When he so stated the contract was completed with defendant in exclusive possession, use and enjoyment of the improvements plaintiff had made under supervision of its president and architect who, as authorized, had given a final certificate of full performance and statement of the balance yet unpaid. The contract specified that—

"Payment on account of contract shall be made at reasonable intervals as the work progresses upon certificates of the architect.   For all but the final payment certificates shall be equal to 85% of the value of labor and material built into the building at the time the certificate is issued, the remaining 15% being retained until the completion of the work."

The effect and conclusiveness of the architect's certificate when thus made a condition precedent to payment is an important element in this case not to be overlooked.   In 9 C. J. p. 772, it is said:

227—Mich.—5.

"In General. The decision, estimate, or certificate of an architect, engineer, or superintendent, in approving or disapproving the work as a performance of a contract, or in passing on questions relating thereto, is, in the absence of fraud, bad faith, or mistake, conclusive and binding on the parties, where the contract, either in express terms provides that it shall be final and conclusive, or in plain language shows that it was the intention of the parties that the person to whom the question is submitted should be the final arbiter thereof."

To this proposition numerous decisions are cited from many jurisdictions, including *Wildey* v. *School District,* 25 Mich. 419; *Kelly* v. *Muskegon Public Schools,* 110 Mich. 529; *Young* v. *Stein,* 152 Mich. 310 (17 L. R. A. [N. S.] 231, 125 Am. St. Rep. 412). The language in article 10 of the contract, relative to the architect's decisions, which authorized him to make decisions "on all claims of the owner or contractor and on all other matters relating to the execution and progress of the work," is only qualified by making his decisions subject to arbitration. Read in connection with other provisions of the contract relative to his rights and duties, this fairly indicates an intention of the parties that he should be the final arbiter on all such questions in the absence of a demand by the aggrieved party for arbitration. No demand was made in this case, and there is no evidence or claim of collusion, fraud, bad faith or mistake on his part.

Throughout the trial defendant's counsel timely objected to all oral evidence tending to show cause of delay or extension of time for performance, as in violation of stipulations in the written contract of which it is said in their brief:

"All extensions of time for completion of work for any cause must be granted by the architect and in accordance with articles 24 and 35 of the contract, which provides:

"'Article 24: Any claim for extension of time caused thereby

(changes in the work) shall be adjusted at the time of ordering the changes.'

"'Article 35:    Any cause which the architect shall decide to justify the delay, then the time of completion shall be extended for such reasonable time as the architect may decide.    No such extensions shall be made for delay occurring more than seven days before claim therefor is made in writing to the architect.    In the case of a continuing cause of delay, only one claim is necessary.' "

Unquestionably the written agreement between these parties merges preceding negotiations to the exclusion of evidence of oral agreements or understandings anterior or contemporaneous with its execution tending to modify or at variance with the terms.    The provisions in it relative to delays, extensions of time, written notice, etc., were binding and plaintiff was bound to observe them at its peril in the absence of any subsequent understanding or agreement between the parties, express or implied, or waiver of them by conduct on the part of defendant.    But the contract can not by its terms, and does not, banish their freedom to subsequently deal with each other relative to it and its subject-matter as they see fit either in modification of its terms or to abrogate it entirely.    A written contract of this nature can no more prohibit otherwise valid oral agreements on the subject than could an oral agreement by like provisions bar the parties from entering into a subsequent written agreement.    Where the subject-matter does not require the contract to be written, oral agreements are as effective as written ones.    *West Haven Water Co.* v. *Redfield,* 58 Conn. 39 (18 Atl. 978) ; *Bartlett* v. *Stanchfield,* 148 Mass. 394 (19 N. E. 549) ; 9 C. J. p. 788 *et seq.,* where abundant authority will be found supporting these principles in foot-notes to the discussion of the subject.

The weight of evidence is persuasive of waiver, which is primarily an issue of fact.    A waiver may be shown by proof of express language of agreement

or inferably established by such declarations, acts and conduct of the party against whom it is claimed as are inconsistent with a purpose to exact strict performance. The following excerpt from Pomeroy on Contracts (2d Ed.), § 394, is fairly in point to the situation shown here:

"The party who is entitled to insist upon a punctual performance by the other, or else that the agreement be ended—may waive his right and the benefit of any objection which he might raise to a performance after the prescribed time, either expressly or by his conduct; and his conduct will operate as a waiver when it is consistent only with a purpose on his part to regard the contract as still subsisting, and not ended by the other party's default."

Defendant first breached this contract and caused delay by failing to provide space and water for plaintiff's operations as it agreed, and thereby set the time at large. It afterwards ordered extra work much of which was necessarily carried on in connection with the original contract and rendered its performance within the time impossible, a fact known to both parties and which in effect resulted in a postponement by mutual consent.

Defendant's claim that, aside from delay, the contract was not fully performed according to its requirements, calls for no extended consideration. Not only does the certificate of defendant's architect who was daily supervising the work show to the contrary, but the great weight of testimony shows that plaintiff made whatever changes or corrections the architect directed to more strictly comply with the contract, and offered to do anything further in that line which he desired and would point out.

The decree will stand affirmed, with costs to plaintiff.

CLARK, C. J., and McDONALD, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.