*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JERRY H. NIEWIEK, individually and as the trustee of the JERRY H. NIEWIEK LIVING TRUST, and MARCIA F. NIEWIEK, as the trustee of the JERRY H. NIEWIEK LIVING TRUST,

Plaintiffs/Counterdefendants-Appellants,

v

BERENDS HENDRICKS STUIT INSURANCE AGENCY, INC.,

Defendant/Counterplaintiff/ Third-Party Plaintiff-Appellee,

and

STEVEN J. OLSON, individually and as the trustee of the STEVEN JORDAN OLSON TRUST, GREGORY T. CHRISTIE, individually and as the trustee of the GREGORY T. CHRISTIE TRUST, GREGORY J. HEERES, individually and as the trustee of the GREGORY T. HEERES TRUST, JAMES H. RYSKAMP, ZACKERY R. VANDENBERG, individually and as the trustee of the ZACKERY AND LISA VANDENBURG TRUST, and PATRICK D. DALTON,

Defendants/Counterplaintiffs-Appellees,

and

BRIAN D. NIEWIEK,

Third-Party Defendant.

UNPUBLISHED
October 1, 2019

No.  343088
Kent Circuit Court
LC No.  16-07277-CBB

-1-

Before: GADOLA, P.J., and MARKEY and RONAYNE KRAUSE, JJ.

PER CURIAM.

Plaintiffs, Jerry H. Niewiek (Niewiek), individually and as the trustee of the Jerry H. Niewiek Living Trust, and Marcia F. Niewiek, as a trustee of the Niewiek Trust, appeal as of right the judgment of no cause of action entered by the trial court in favor of defendants, Berends Hendricks Stuit Insurance Agency, Inc. (Berends), Steven J. Olson, individually and as the trustee of the Steven Jordan Olson Trust, Gregory T. Christie, individually and as the trustee of the Gregory T. Christie Trust, Gregory J. Heeres, individually and as the trustee of the Gregory T. Heeres Trust, James H. Ryskamp, Zackery R. Vandenberg, individually and as the trustee of the Zackery and Lisa Vandenburg Trust, and Patrick D. Dalton.[1] On appeal, plaintiffs contend that the trial court erred in granting defendants a judgment of no cause of action. We affirm.

## I. FACTS

This is a contract dispute involving the valuation of Berends, an insurance agency, for purposes of a forced buyout by the company of the Berends' stock held by plaintiff, Jerry Niewiek, through his trust. Plaintiffs contend that defendants breached the parties' shareholder agreement by undervaluing the stock.

Niewiek joined Berends in 1988, and became a shareholder in 1995. Over time, he purchased 104,199 shares of the company. In 2005, Berends began to use Reagan Consulting (Reagan) to value its shares; Reagan valued Berends in 2005, 2007, 2008, 2009, and 2010. In 2011, Berends and its shareholders executed a shareholder agreement governing the parties' rights and obligations. The agreement provides that if any shareholder's employment is voluntarily or involuntarily terminated, Berends has the right to purchase that shareholder's shares as follows, in relevant part:

> 14. <u>Stock Purchase Option and Non-competing Provision</u>. In the event a Shareholder's employment with the Company should be voluntarily or involuntarily terminated for any reason other than death or total disability, the Company shall have the right, privilege and option of purchasing all the stock of the Shareholder, which stock shall be sold and purchased upon the following terms and conditions:
>
> * * *
>
> (b) The price and terms for the purchase of said stock shall be determined in accordance with paragraph 11 hereinabove set forth;

Paragraph 11 provides for the valuation of the stock as follows, in relevant part:

---

[1] Third-party defendant, Brian D. Niewiek, is not a party to this appeal.

11. _Purchase Price_. . . . . the purchase price for each share of the Company to be sold pursuant to the purchase options or obligations contained in this Agreement shall be the amount per share agreed upon by the Shareholder and the Company established concurrently with the execution of this Agreement and updated as provided below, said value hereinafter referred to as "Agreed Value Per Share.". . .

In the event the Valuation Date of the most recent certification of Agreed Value Per Share is more than twelve (12) months prior to the event creating the option or obligation to purchase or sell the shares, the Agreed Value Per Share shall be unanimously agreed upon by the selling Shareholder . . . and Company. . . . In the event such an agreement cannot be reached, the Agreed Value Per Share shall be the fair market value of the Company for perpetuation planning as of the year end immediately preceding the event giving rise to the option or obligation to purchase . . . as determined by Reagan Consulting, Inc., or other appraiser or consultant selected by the Company with a nationally recognized reputation for valuing insurance agencies, . . . .

In sum, under paragraph 11 of the shareholder agreement, the stock is to be valued at the agreed value per share established periodically under the agreement. If the established agreed value per share is more than 12 months old, the stock is to be valued at the price agreed to by the selling shareholder and Berends. If they are unable to agree, the agreed value is to be the fair market value of the Company for perpetuation planning as of the year end immediately preceding the event giving rise to the option or obligation to purchase, as determined by Reagan, or other appraiser selected by Berends.

In November 2015, after a dispute between Niewiek and the other shareholders, Berends asked Niewiek to resign. Thereafter, Berends requested that Reagan value the company to ascertain the per share price of its stock. Based upon Reagan's valuation, Berends offered to buy Niewiek's shares at $95.96 per share. Niewiek refused to sell at that price and initiated this action, alleging that defendants were breaching the shareholder agreement by failing to accurately value the shares. Niewiek also sought declaratory relief, and further alleged minority shareholder oppression, breach of fiduciary duty, and civil conspiracy. Defendants thereafter filed a counterclaim, alleging breach of contract and breach of fiduciary duties. The parties eventually stipulated to dismiss all claims except plaintiffs' claim that Berends and the other shareholders breached the shareholder agreement by offering to buy Niewiek's shares at a value that was below fair market value. A bench trial was held on this issue alone.

During the bench trial, the evidence primarily concerned whether Thomas Doran of Reagan Consulting properly valued Berends for purposes of establishing the per share value of $95.96 for Berends' stock. Plaintiffs' expert, Jesse Ultz, testified that the shares were properly valued at $170.03 per share, pointing to a number of alleged errors in Reagan's valuation. At the conclusion of trial, the trial court entered a judgment of no cause of action against plaintiffs and dismissed their claim. In its written findings of fact and conclusions of law, the trial court found that the parties to the shareholder agreement contractually agreed to the valuation of the stock by Reagan. The trial court determined that it could only reject that value if plaintiffs demonstrated that the valuation was the product of bad faith, fraud, or gross mistake, and noted that plaintiffs had challenged the valuation only on the ground of gross mistake. The trial court then summarized the evidence and identified the points of dispute with the valuation, finding that for

each disputed point there was a reasonable explanation for the conclusion arrived at by Reagan. The trial court concluded that there was no evidence that Reagan made a gross mistake in the calculation of the stock value, and dismissed plaintiffs' claim. Plaintiffs now appeal to this Court.

## II. DISCUSSION

### A. STANDARD OF REVIEW

We review de novo the proper interpretation of a contract, which is a question of law. *Innovation Ventures v Liquid Mfg*, 499 Mich 491, 507; 885 NW2d 861 (2016). We review for clear error a trial court's factual findings after a bench trial. See *Sands Appliance Services, Inc v Wilson*, 463 Mich 231, 238; 615 NW2d 241 (2000). A finding is clearly erroneous when this Court is left with the definite and firm conviction that the trial court made a mistake. *DC Mex Holdings LLC v Affordable Land LLC*, 320 Mich App 528, 546; 907 NW2d 611 (2017).

### B. BINDING VALUATION

Plaintiffs contend that defendants breached the shareholder agreement by asserting the right to purchase the 104,199 shares held by Niewiek through his trust at $95.96 per share, which was the value per share calculated based on Reagan's valuation of Berends. In interpreting a contract, our primary obligation is to give effect to the intention of the parties at the time they entered into the contract. *Miller-Davis Co v Ahrens Const, Inc*, 495 Mich 161, 174; 848 NW2d 95 (2014). The best indicator of the parties' intent is the plain and unambiguous language of the contract. See *Wyandotte Electric Supply Co v Electrical Technology Sys, Inc*, 499 Mich 127, 143-144; 881 NW2d 95 (2016). If the terms are unambiguous, this Court must enforce the agreement as written. *Innovation Ventures*, 499 Mich at 507. The rights and duties of parties to a contract are thus determined by the terms of the agreement, and generally, parties have "the utmost liberty of contracting" and "their agreements voluntarily and fairly made shall be held valid and enforced in the courts." *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 62-63; 664 NW2d 776 (2003) (quotation marks and citation omitted).

An appraisal agreement is an agreement that a third party shall determine the value of a claim or property. *E E Tripp Excavating Contractor, Inc v Jackson Co*, 60 Mich App 221, 246; 230 NW2d 556 (1975). Michigan law gives effect to appraisal agreements. *Id*., citing *Noble v Grandin*, 125 Mich 383; 84 NW 465 (1900), and *Weggner v Greenstine*, 114 Mich 310; 72 NW 170 (1897). See also *Strom-Johnson Construction Co v Riverview Furniture Store*, 227 Mich 55, 66; 198 NW 714 (1924) (parties who contract to abide by the valuation of some commodity by a third party are bound by the valuation in the absence of fraud or mistake).

In this case, the parties do not dispute that the valuation of Berends' shares is controlled by the shareholder agreement. The shareholder agreement provides that Berends may purchase a shareholder's shares when that shareholder leaves employment with Berends, that the per share value is to be set by agreement, that if the parties do not agree, then the per share price "shall be the fair market value of the Company for perpetuation planning," and that Reagan (or another appraiser or consultant selected by Berends) will determine the fair market value of Berends for perpetuation planning. This unambiguous provision of the shareholder agreement demonstrates the parties' intent. See *Wyandotte Electric Supply Co*, 499 Mich at 143-144. The fact that the shareholder agreement does not specifically state that the Reagan valuation will be "final" or

"binding," does not negate the parties' agreement. See *Strom-Johnson Construction Co*, 227 Mich at 66 (an agreement to abide by a third-party's assessment as final is conclusive and binding even if the agreement does not use that specific language, if the plain language of the agreement shows the parties' intent to be bound). Consequently, the parties in this case agreed to be bound by Reagan's valuation in determining the fair market value of Berends for perpetuation planning.

Plaintiffs, however, dispute whether Reagan properly valued the shares. Our Supreme Court long ago established that when parties contractually agree to commit the valuation of some commodity to a third party, they are then bound by the valuation in the absence of fraud or mistake. See *Walter N Kelley Co v Andrews*, 225 Mich 403, 415; 196 NW 407 (1923). The purpose of this rule is to prevent later disputes by binding the parties to an agreed-upon third-party's determination. *Id*. In some instances, the Court has cited with approval treatise language stating that such a valuation is binding in the absence of fraud, bad faith, or mistake. See *Strom-Johnson Construction Co*, 227 Mich at 66; see also *WJ Howard & Sons, Inc v Meyer*, 367 Mich 300, 309-310; 116 NW2d 752 (1962).

In other instances, our Supreme Court has stated that parties who agree to a valuation or calculation by a third party are bound in the absence of fraud or *gross* mistake. See *Brooks v Bellows*, 179 Mich 421, 431; 146 NW 311 (1914); see also *Moran v Schmitt*, 109 Mich 282, 292; 67 NW 323 (1896) ("The rule is well settled that an award or estimate, if made, can be impeached for fraud, or such gross mistake as would necessarily imply bad faith, or failure to exercise an honest judgment in the premises."); and also see *Carlini v US Rubber Co*, 8 Mich App 501, 505; 154 NW2d 595 (1967).[2] In *Malone v Gates*, 87 Mich 332, 336; 49 NW 638 (1891), our Supreme Court explained that it used the term gross mistake to signify "a mistake not depending upon the judgment of the [appraiser]," and an error other than "an honest error of judgment." That understanding is consistent with the definition stated in *Moran*, that an estimate "can be impeached for fraud, or such gross mistake as would necessarily imply bad faith, or failure to exercise an honest judgment in the premises." *Moran*, 109 Mich at 292. We therefore conclude that Reagan's valuation is binding upon the parties unless its valuation was demonstrated to be the product of fraud or gross mistake, being a mistake that rises to the level of a failure to exercise honest judgment. See *Strom-Johnson Construction Co*, 227 Mich at 66; *Malone*, 87 Mich at 336.

## C.  SPECIFIC ALLEGATIONS OF ERROR

Plaintiffs' specific allegations of error arise from the opinion of their expert, Jesse Ultz, that the Reagan valuation as calculated by Doran is rendered inaccurate by fundamental errors.

---

[2] Although this Court is not required by MCR 7.215(J)(1) to follow the rule of law established by this Court in an opinion published before November 1, 1990, we traditionally regard published cases of this Court issued before November 1, 1990 as retaining some authority. See *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018). See also MCR 7.215(C)(2), providing that published opinions of this Court have precedential effect under the rule of stare decisis. *People v Bensch*, ___ Mich App ___, ___; ___ NW2d ___ (2019) (Docket No. 341585), slip op at 2 n 6.

Based on Ultz's assessment of error in the Reagan valuation, plaintiffs contend that Reagan failed to properly determine the value of the Berends' stock.

Ultz's testimony can be summarized as follows: Ultz reviewed Doran's valuation of Berends and relied on it as a baseline. He noted that Doran used three separate valuation techniques: the discounted cash flow analysis and two forms of the market approach, being the guideline public companies method and the merger and acquisition transactions method. Ultz testified that the income approach looks at the cash flow that the business is expected to generate in the future "discounted back to today at a rate of return that matches the risk of actually achieving those cash flows." He explained that the most common way to determine discounted cash flow is to look at the weighted average cost of capital. Ultz opined that the three valuation approaches used by Doran were proper approaches, and that cash flow value drives businesses such as insurance businesses. However, Ultz observed that when Doran applied the three valuation approaches, there appeared unusually large variations between the market approaches and the discounted cash flow analysis compared to past valuations by Reagan. Ultz explained that the differences previously had been in the range of 10 to 20%, but the difference was 70% for the valuation at issue in this case, which he considered an indicator that Doran's report contained serious errors.

Ultz did not find mathematical errors in Doran's report, but identified four metrics that he found to be incorrect: (1) the rate of return used in the discounted cash flow analysis was incorrect because the underlying inputs for that formula did not correspond with the correct market data, (2) in applying the approaches, Doran had weighted the discounted cash flow method at 80% and then 10% for each of the market approaches, while Ultz believed that the three approaches should be weighted equally, (3) Ultz applied a 15% S-corporation premium to the valuation because S-corporations avoid the double taxation problems associated with C-corporations, which Doran had not applied (though Ultz later agreed that the use of an S-corporation premium is an area where valuation experts disagreed); and (4) unlike Doran, Ultz subtracted current liabilities as though they all had to be paid at the point of the valuation, and Ultz added back the full $6.2 million in cash on hand to the value of the business.

Plaintiffs contend that these errors resulted in Reagan miscalculating the fair market value of Berends' stock. Ultz testified that Doran indicated that he was using a fair market value standard—as opposed to fair value or investment value—in appraising Berends, which is "the price that an asset would change hands between a hypothetical willing buyer and seller when both have all the information that they need, and they're not compelled to act; they can act freely." Ultz testified that "perpetuation planning" is not a standard of value. After hearing Doran's explanations for his weighting of the approaches, Ultz understood that Doran interpreted perpetuation planning to mean that the value should be ascertained by reference to an internal buyer. That, Ultz stated, was in effect an investment value, not a fair market value.

Ultz testified in more detail about the errors in the discounted cash flow analysis employed by Reagan and opined that the errors all related to components of the weighted average cost of capital. Ultz testified that Doran failed to use the "risk-free rate plus beta," wherein the risk-free rate is the treasury rate, and instead used a normalized rate, which is appropriate when the rates are artificially low. Ultz further testified that Doran did not use the correct data for normalizing, which in Ultz's opinion resulted in inflated equity rate of return. However, Ultz agreed that it was a judgment call as to which method to use—actual risk-free

rate or normalized risk-free rate—but testified that once an analyst picked a method, he or she had to follow the rules for that method.

The next error Ultz asserted in the discounted cash flow analysis was the corporate bond rate. At the time it was 4.68%, and Doran used 6% on the basis of a 10-year average. By using a 10-year average, Doran captured the recession, when the cost of capital was unusually high, but failed to consider that in 2014 the market had improved dramatically. Ultz opined that the artificially inflated weighted average cost of debt caused the discounted cash flow analysis to result in an outlier. Doran also had used a lower cost of capital calculation, being 12.5% rather than 20%, increasing the weighted average cost of capital.

Finally, Ultz did not agree with the specific risk premium applied to the weighted average cost of capital. Historically, Berends had increased its EBITDA—the earnings before interest, tax, depreciation, and amortization—every year for the last five years, but Reagan's valuation assumed that it would decline every year for the next five years. According to Ultz, Reagan had already adjusted the cash flow to reflect risk, essentially double-counting the risk. Ultz agreed on cross-examination that whether to use a company-specific risk premium was a matter of judgment.

### 1. FAIR MARKET VALUE

Plaintiffs first argue that Reagan failed to follow the requirements of the shareholders' agreement because Reagan did not value Berends using fair market value as mandated by the shareholder agreement, but instead applied the "internal transaction value." The shareholder agreement, however, required Reagan to value Berends not merely at the fair market value, but at the "fair market value of the Company for perpetuation planning . . . without applying lack of marketability or control discounts." In its opinion, the trial court observed: "Thus, the dispute can be reduced to a disagreement about 'the fair market value of [Berends] for perpetuation planning. . .' The Court must decide whether the Reagan Report is based upon a 'gross mistake' that renders its valuation unsustainable."

Ultz criticized Doran's decision to give more weight to the discounted cash flow method of valuation over the market methods to derive a value that ultimately was not in accord with street value. Ultz testified that Doran employed three tests of value or valuation methods—discounted cash flow, guideline public company method, and mergers and acquisitions method—that were typically applied to calculate fair market value. Ultz found fault with Doran's decision to weigh the first method more heavily than the others because, in Ultz's view, Doran's discounted cash flow calculation had errors that made it an outlier and rendered it unreliable for determining fair market value.

However, Doran testified that he calculated the fair market value of Berends in a manner that was consistent with his previous valuations of Berends and consistent with Reagan's methods. Moreover, Doran testified that he calculated the fair market value of the stock "for perpetuation planning," which involves structuring the insurance agency to perpetuate ownership without interruption. He also testified that he gave controlling weight to the income approach to valuation because insurance agencies rely heavily upon future earnings to provide income, and that discounted cash flow results are always lower than market approach results.

-7-

Ultz testified that there was no standard of value that included the phrase "for perpetuation planning;" he further noted that Reagan did not mention that phrase in its report. Despite Ultz's testimony, the shareholders—including Niewiek—each testified or agreed with the testimony that the phrase "for perpetuation planning" was deliberately added to the shareholders' agreement and was intended to express the goal of maintaining the business as a going concern and as an independent agency.

On this record, the trial court did not clearly err in finding no gross mistake in Reagan's calculation of Berends' fair market value for perpetuation planning, as required under the shareholders' agreement. The fact that there was evidence that appraisers do not recognize a standard of value or premise of value "for perpetuation planning" did not preclude the parties from agreeing that an appraiser's valuation of a business at fair market value should take into consideration the owners' desire to perpetuate the business in its current form. The law does not preclude parties from contractually modifying a valuation method, and this Court must give meaning to the shareholders' decision to include that language as far as practicable. See *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 467; 663 NW2d 447 (2003). Consequently, the trial court did not err in concluding that the shareholders' agreement authorized Reagan to weigh the various methodologies[3] for determining fair market value to emphasize the method that best captured the fair market value for a buyer who is amenable to maintaining the agency's current business model.

### 2. WEIGHTING OF VALUATION METHODOLOGIES

The trial court also did not err when it determined that Doran's weighting of the three approaches was not a gross mistake. Doran testified that he followed Reagan's practice of assigning an 80% weight to the discounted cash flow method because of the peculiar nature of the business of selling insurance. He explained that insurance businesses typically derive their value from their cash flow rather than physical assets. He therefore more heavily weighted the discounted cash flow method for calculating fair market value because that method more accurately captured the value of the entity to a purchaser who intended to recoup his or her investment over time through the entity's normal operations. Doran further testified that he applied the weighting that Reagan had always applied over a period of years. Doran further indicated that Reagan had always taken into consideration the unique characteristics of the agencies that it regularly values when weighting the various valuation methodologies.

Doran conceded that the market approaches for valuation tended to provide higher values, but explained that the market approaches examined circumstances where large insurance firms purchased smaller firms and paid a premium on the assumption that the firm would be able to reduce expenses while maintaining the smaller firm's cash flow. He explained that the

---

[3] Plaintiffs argue that the trial court erred when finding that Niewiek has long benefited from Reagan's weighting valuation and thus should not contest it now. Although the trial court opined that Niewiek's concern that Reagan was suddenly misapplying the fair market value standard rang hollow, it did not conclude that it had to defer to the Reagan valuation on that basis. Rather, the trial court found that it was obligated to defer to the Reagan valuation absent a demonstration of fraud, bad faith, or gross mistake.

purchasing firm would typically eliminate staff, sell off unneeded offices, consolidate operations, and find other efficiencies. In that way, the larger firm could recoup its investment despite paying a premium. Such calculations, however, ignored the circumstances typically involved in the sale of equity for smaller firms that want to perpetuate their ownership over time. Doran criticized Ultz's corrected valuation because, if it were actually applied, the shareholders of Berends would have no way to perpetuate their business as a going concern given the business's cash flow; they would have to sell the agency to a larger firm in order to raise the funds to pay a departing shareholder under Ultz's valuation.

Moreover, Ultz admitted that an appraiser had discretion to weigh the different valuation methodologies to better reflect what the appraiser felt was an accurate understanding of the business's fair market value. Because Doran's decision to weigh the discounted cash flow method more heavily than the market methods was a matter committed to Doran's judgment, Ultz's mere disagreement with Doran's weighing of the discounted cash value at 80% does not establish an error that invalidated the valuation by Reagan. Accordingly, the trial court did not err when it determined that plaintiffs failed to establish that Doran's weighting of the three methods amounted to a gross mistake.

### 3. HANDLING OF OUTLIER VALUE

Plaintiffs also contend that Doran made a mistake in the valuation when he failed to correct or disregard his discounted cash flow value after he determined that it was an outlier from his two market-based valuations. Plaintiffs rely on Ultz's testimony that, when presented with an outlier valuation, a valuator should do one of three things: discard the method as unreliable, give it a low weight, or investigate why it is so different and correct any errors or reassess the assumptions to make sure that it makes sense and is reasonable. However, this testimony merely established that Doran had a range of possible actions that he could take in analyzing the outlier value suggested by his application of the discounted cash flow method; it did not establish that Doran had to handle the suggested value in some specific way such that his failure to handle it would amount to a gross mistake.

Doran testified that the value suggested by the discounted cash flow method was an outlier, and that he therefore reviewed the underlying calculations. After he determined that there were no mathematical errors, he concluded that the value remained the best indicator of an investor who expected to get a return on his or her investment through cash flow. Doran testified that the values suggested by the market approaches were inflated because there had been a bull market on the "buy side" of the insurance industry. Doran thus undertook the reevaluation that Ultz identified as the third option for handling an outlier value: he reexamined the calculation for errors and reevaluated his assumptions, and then determined that it was reasonable to continue using that value, combined with the market approaches. Doran testified that he followed the procedures recommended for handling outliers by a noted author of a treatise on the subject, and that with any outlier, the ultimate determination must be left to the judgment of the appraiser. Because Doran exercised his judgment, as Ultz stated he was permitted to do under the valuation standards, Ultz's disagreement with Doran's exercise of judgment was not sufficient to establish a gross mistake.

## 4. ERRORS IN DISCOUNTED CASH FLOW METHOD

Plaintiffs also contend that the trial court erred when it ignored evidence that Doran made several gross mistakes in applying the discounted cash flow method for valuing Berends. Specifically, plaintiffs argue that Doran miscalculated the weighted cost of capital by using an incorrect risk-free rate and by using an incorrect corporate bond rate. Ultz testified that, when calculating the weighted average cost of capital, one must determine the cost of equity. Normally, one would use the 20-year treasury bond rate for the risk-free rate of that formula. Although he acknowledged that one could also normalize that rate when the treasury rates were artificially low, which was the case during the period at issue, he opined that Doran erred by using figures from both the risk-free rate method and the normalizing rate method. More specifically, he criticized Doran's use of the wrong equity risk premium with the normalized rate method.

By contrast, Doran testified that normalizing the rates created a more accurate picture, and that it was not inconsistent to establish the risk-free rate by averaging figures for the risk-free rate over 10 years. Because there was competing evidence about the propriety of calculating the risk-free rate, it was for the finder of fact to determine whether Doran was required to use a particular input. The trial court concluded that Doran's normalizing of the rate could not be described as a gross mistake. On this record, that finding was not clearly erroneous.

The same is true of the bond rate. Ultz testified that Doran erred when he used a 10-year average for the bond rate; Doran testified that whether to use a normalized bond rate was a matter committed to his judgment. Doran explained that Reagan developed its normalized values because it was not trying to capture the discount rate for a particular moment in time; rather, it normalized the rates to develop a discount rate that would reflect a very long period. Again, the trial court did not clearly err in finding that Ultz's disagreement with Doran's exercise of judgment was insufficient to establish gross mistake.

## 5. ERRORS IN EQUITY ADJUSTMENTS

Plaintiffs also contend that Doran erred when he failed to add back $6.2 million in cash that Berends held on the valuation date, but instead subtracted the company's liabilities, and erred when he refused to apply a premium value for Berends' status as an S-corporation. Ultz testified that the valuation methods assume that a company will continue to operate in perpetuity, which means that the company will not have to pay off its current liabilities, and that a proper valuation therefore does not subtract current liabilities. He concluded that Doran made a mistake when he chose to adjust the cash on hand by subtracting the value of current liabilities. Doran disagreed. He testified that the liabilities were not accounted for in the cash flow analysis and had to be captured somewhere. He felt that it was appropriate to capture them by subtracting the amount of the liabilities from the cash on hand. However, no testimony established that there was a clear rule regarding the proper handling of cash on hand.

The same was true of Ultz's claim that Doran made a mistake by not adjusting the value of Berends by adding a 15% premium to reflect the tax benefits of being an S-corporation. The testimony established that the application of a premium to the equity of an S-corporation was not an established rule, but rather a matter of some controversy. The trial court therefore did not err when it determined that Doran's treatment of this factor was not a gross mistake.

In sum, the trial court did not err when it determined that plaintiffs failed to establish that the valuation provided by Reagan was the product of a gross mistake. Consequently, the trial court did not err when it concluded that the valuation was binding on the parties.

Affirmed.

/s/ Michael F. Gadola
/s/ Jane E. Markey
/s/ Amy Ronayne Krause