811 F.2d 326
 DeVALK LINCOLN MERCURY, INC., an Illinois corporation,
Harold G. DeValk and John M. Fitzgerald,
Plaintiffs-Appellants,
v.
FORD MOTOR COMPANY, a Delaware corporation, and Ford Leasing
Development Company, a Delaware corporation,
Defendants-Appellees.
 No. 86-1638.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 24, 1986.
Decided Jan. 16, 1987.
Rehearing Denied Feb. 23, 1987.
 
 William J. Harte, William J. Harte, Ltd., Chicago, Ill., for plaintiffs-appellants.
 Thomas B. McNeill, John M. Carroll, George N. Vurdelja, Jr., Mayer, Brown & Platt, Chicago, Ill., for defendants-appellees.
 Before WOOD, Jr., and POSNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 Plaintiffs Harold DeValk, John Fitzgerald, and DeValk Lincoln Mercury, Inc. ("DLM"), appeal a grant of summary judgment in favor of defendants Ford Motor Company and Ford Leasing Development Company (collectively "Ford").
 
 
 2
 Plaintiffs DeValk and Fitzgerald were owners and managers of an automobile dealership, DeValk Lincoln Mercury, in Chicago, Illinois. In August 1979, after several months of poor performance, DLM submitted its resignation as a Lincoln-Mercury dealership to Ford. DLM and Ford then entered into negotiations to wind up the dealership's affairs and to transfer DLM's inventory back to Ford pursuant to contractual agreements. Disputes arose during these negotiations. The disputes went unresolved and plaintiffs eventually brought this lawsuit against Ford alleging violations of the Automobile Dealers Day in Court Act, 15 U.S.C. Secs. 1221 et seq. (1982), breach of contract, breach of fiduciary duty, and fraud. After some of plaintiffs' claims were dismissed, defendants moved for summary judgment on the remaining claims. The district court granted defendants' motion for summary judgment on all the remaining claims. We affirm.
 
 I. FACTUAL BACKGROUND
 
 3
 In 1976 three Lincoln-Mercury dealerships served the near northwest side of Chicago, Illinois. In the spring of that year, Ford conducted a marketing study of the area and concluded that, in light of a declining market trend, consideration should be given to eliminating one of the three dealerships at the time ownership changed hands at any one of them. At the time this study was completed, and unaware of its existence, plaintiff DeValk was negotiating with Czarnowski Lincoln-Mercury, one of the three dealerships, to purchase its assets and also was approaching Ford to seek approval to operate a dealership at Czarnowski's geographic location. DeValk also worked at this time as general manager of Czarnowski. In March 1977 Ford approved DLM as a Lincoln-Mercury dealership and executed with DLM standard Lincoln and Mercury Sales and Service Agreements ("Sales Agreements") by which DLM could purchase automobiles, parts, signs, tools, and other items from Ford.
 
 
 4
 At the time control of the dealership changed hands, Czarnowski Lincoln-Mercury was struggling. It did not have floor plan financing to purchase new automobiles. It could only get parts from Ford on a C.O.D. basis. Czarnowski did not have adequate resources to perform warranty work and its reputation in the community suffered as a result. Moreover, employee morale was low.
 
 
 5
 In spite of DeValk's efforts as the new owner, the dealership continued to suffer. Throughout 1977 and into 1978, DLM experienced losses. In July 1978, based in part on the amended market study completed in the spring of 1976, Ford informed DeValk it had placed DLM on "delete status." That delete status meant that Ford would not continue a Lincoln-Mercury dealership at DLM's location once DeValk ceased to be the majority owner of the dealership. In late September or early October, DLM hired plaintiff Fitzgerald as general sales manager. Five months later, in February 1979, Fitzgerald purchased a 45% interest in DLM. In February, March, and April, DLM managed to turn a profit. By August, however, DeValk and Fitzgerald decided to terminate the dealership. DLM submitted its resignation to Ford on August 23rd to become effective in October. DLM's resignation letter made no claims against Ford and reserved no rights to pursue any action against Ford. DLM's resignation letter also requested Ford to repurchase DLM's current inventory of automobiles. Ford accepted the resignation on October 1st, and DLM ceased operations on October 11th. In late October Ford took back DLM's inventory of parts and current model automobiles and credited DLM's account for those repurchases. Negotiations ensued over the inventory repurchases and other items, which engendered the disputes eventually giving rise to this lawsuit.
 
 II. LEGAL STANDARD
 
 6
 In reviewing a grant of summary judgment we decide whether the legal papers on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Our review thus takes two steps. We first determine whether there are any genuine issues of material fact. In making this determination, we draw all inferences in the light most favorable to the non-movant. Bartman v. Allis-Chalmers Corp., 799 F.2d 311, 312 (7th Cir.1986); Rodeo v. Gillman, 787 F.2d 1175 (7th Cir.1986). But in so doing, we draw only reasonable inferences, not every conceivable inference. Bartman v. Allis-Chalmers Corp., 799 F.2d 311, 312-13 (7th Cir.1986); Matthews v. Allis-Chalmers, 769 F.2d 1215, 1218 (7th Cir.1985). If we find that any genuine issues of material fact do exist, then summary judgment was improperly granted and we must reverse. If, however, we find there are no genuine issues of material fact, we then determine as a second step whether summary judgment is correct as a matter of law.
 
 III. DISCUSSION
 
 7
 Plaintiffs' contentions for purposes of this appeal can be divided into two categories. One set of claims relates to paragraph 23 of the Sales Agreements between Ford and DLM and the other set relates to paragraphs 21(b) & 21(c). Before examining the two sets of claims themselves, however, we turn to choice of law considerations.
 
 A. Choice of Law
 
 8
 Both sets of claims relevant to this appeal center on the Sales Agreements between Ford and DLM. The Sales Agreements contain a choice of law clause that specifies Michigan's law as the controlling law for construing the provisions of the Sales Agreements. This case, however, was brought in federal court in Illinois, not Michigan. The claims at issue here are based on diversity jurisdiction. Well settled law holds that federal courts resolving diversity claims must apply state law. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Moreover, the state law applied by federal courts must be the forum state's law on resolving conflicts of law. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Casio, Inc. v. S.M. & R. Co., 755 F.2d 528, 531 (7th Cir.1985).
 
 
 9
 In this instance we look to the forum state, Illinois, to determine how its conflict of law principles treat choice of law clauses in contracts. We recently had occasion to make this inquiry with respect to Illinois's law and we noted that "Illinois courts, which have long allowed parties to 'substitute the laws of another place or country,' will enforce the substituted law 'where it is not dangerous, inconvenient, immoral, nor contrary to the public policy of the local [i.e., Illinois] government.' " Sarnoff v. American Home Products Corp., 798 F.2d 1075, 1081 (7th Cir.1986) (quoting McAllister v. Smith, 17 Ill. 328, 333 (1856)); see also Hofeld v. Nationwide Life Insurance Co., 59 Ill.2d 522, 322 N.E.2d 454, 458 (1975); Swanberg v. Mutual Benefit Life Insurance Co., 79 Ill.App.3d 81, 34 Ill.Dec. 624, 398 N.E.2d 299, 301 (1st Dist.1979).
 
 
 10
 A federal court sitting in Illinois, therefore, should honor a contractual choice of law clause specifying Michigan law as controlling, unless the applicable Michigan law is dangerous, inconvenient, immoral, or contrary to public policy. As will become apparent in our discussion of the construction of the Sales Agreements, the applicable Michigan law does not fall outside the bounds set by Illinois's conflict of laws principles, and will, therefore, be honored as the parties' choice of law.
 
 B. Paragraph 23 Claims
 
 11
 Among other things, the Sales Agreements between Ford and DLM provide that when Ford or the dealer terminates or fails to renew the dealership, the dealer is entitled to receive certain benefits. These benefits include Ford's willingness to buy back the current inventory of automobiles and parts from the dealer. But in consideration of agreeing to buy back the inventory, the Sales Agreements provide in relevant part of paragraph 23 that the dealer will release Ford from liability except with respect to claims arising under paragraphs 19(f), 21, and 22 of the Sales Agreements:
 
 
 12
 [U]pon the Dealer's demand of any such benefits upon any termination or nonrenewal by the Dealer, the Company shall be released from any and all other liability to the Dealer with respect to all relationships and actions between the Dealer and the Company, however claimed to arise, except any liability that the Company may have under subparagraph 19(f) and said paragraphs 21 and 22, and except for such amounts as the Company may have agreed in writing to pay to the Dealer. Simultaneously with the receipt of any benefits so elected or demanded, the Dealer shall execute and deliver to the Company a general release with exceptions, as above described, satisfactory to the Company. (emphasis added)
 
 1. Ambiguity
 
 13
 Plaintiffs argue that paragraph 23's release of liability is ambiguous. Under Michigan law a contractual provision is ambiguous "if the language of a written contract is subject to two or more reasonable interpretations or is inconsistent on its face." Petovello v. Murray, 139 Mich.App. 639, 362 N.W.2d 857, 858 (1984). Plaintiffs argue paragraph 23 is ambiguous because it is subject to at least two interpretations. They contend that the requirement of a written general release by the dealer at the time benefits are received modifies the earlier nebulous release granted by the dealer at the time benefits are demanded. If the initial release is automatic and absolutely effective at the time the dealer makes the demand, plaintiffs ask, why does paragraph 23 discuss the requirement of a written release in the very next sentence? See McIntosh v. Groomes, 227 Mich. 215, 198 N.W. 954, 955 (1924) (" 'Every word in the agreement must be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument.' ") (quoting 6 R.C.L. 838).
 
 
 14
 Such a conundrum, plaintiffs contend, renders paragraph 23 ambiguous and necessarily requires the court to do one of two things. First, it requires the court to construe paragraph 23 against Ford and in favor of DLM. This result follows from the canon of construction, honored in Michigan, that a written agreement is construed against its drafter. Lichnovsky v. Ziebart International Corp., 414 Mich. 228, 324 N.W.2d 732, 738 (1982); Petovello v. Murray, 139 Mich.App. 639, 362 N.W.2d 857, 858 (1984); accord Advance Process Supply Co. v. Litton Industries Credit Corp., 745 F.2d 1076, 1079 (7th Cir.1984). Or second, it requires the court to resolve factual issues in determining the intent of both DLM and Ford with respect to paragraph 23. Barner v. City of Lansing, 27 Mich.App. 669, 183 N.W.2d 877 (1970). And if factual issues exist, which require resolution, the district court cannot grant summary judgment. Peoples Outfitting Co. v. General Electric Credit Corp., 549 F.2d 42, 46 (7th Cir.1977).
 
 
 15
 Defendants contend, on the other hand, and the district judge agreed, that paragraph 23 is unambiguous under Michigan law. They argue that plaintiffs' interpretation of paragraph 23 is unreasonable and that paragraph 23 is not inconsistent on its face. Defendants explain that the initial release is controlling as to any and all liability on Ford's part. It is absolute in its effect. Any subsequent written release executed by the dealer merely memorializes the initial release and reminds the parties of their respective obligations. In reaching this conclusion, defendants and the district judge relied on the only relevant precedent that seems to be available with respect to this particular release clause.[1] After this lawsuit was initiated, a district court in the Western District of Virginia held unambiguous the release clause of paragraph 23 of the standard Ford Sales and Service Agreement. That court explained:
 
 
 16
 The court can find no ambiguity in Paragraph 23 of the Agreement which unequivocally states that Ford "shall be released " upon the date plaintiffs elect to accept the benefits provided for in the Standard Provisions.... Ford is released upon Plaintiffs' election to accept the offered benefits, then an executed release is only required upon the Dealer's receipt of benefits so elected.... Accordingly, the court agrees with defendant's position that the written release of January 8, 1982 serves only as a memorialization of the event which automatically triggered the general release of Ford.
 
 
 17
 Ray Dobbins Lincoln-Mercury, Inc. v. Ford Motor Co., No. 83-M-10-R, slip op. at 6-7 (W.D.Va. Aug. 16, 1984) (emphasis in original), aff'd, 813 F.2d 402 (4th Cir.1985) (per curiam).
 
 
 18
 We agree. Paragraph 23 is unambiguous. It plainly states that when the dealer, DLM, demands the benefits of returning inventory, "the Company shall be released from any and all other liability to the Dealer." We can scarcely conceive of a more clearly written release of liability. The subsequent requirement for a written document simply allows the parties to memorialize an automatic release already in effect. Because "[i]t is well settled that summary judgment may be employed in disputes involving the interpretation of an unambiguous contract," Water Technologies Corp. v. Calco, Ltd., 576 F.Supp. 767, 773 (N.D.Ill.1983), we affirm the district judge's construction of paragraph 23 as unambiguous on its face and, as far as these arguments are concerned, his grant of summary judgment in defendants' favor.
 
 2. Parol Evidence
 
 19
 Plaintiffs protest, however, that even if paragraph 23 is construed to be unambiguous on its face, extrinsic evidence tends to show that paragraph 23 is latently ambiguous. The Supreme Court of Michigan explained:
 
 
 20
 [W]here a latent ambiguity exists in a contract, extrinsic evidence is admissible to indicate the actual intent of the parties as an aid to the construction of the contract.
 
 
 21
 A latent ambiguity is one "where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among 2 or more possible meanings...." Since the detection of a latent ambiguity requires a consideration of factors outside the instrument itself, extrinsic evidence is obviously admissible to prove the existence of the ambiguity, as well as to resolve any ambiguity proven to exist.
 
 
 22
 McCarty v. Mercury Metalcraft Co., 372 Mich. 567, 127 N.W.2d 340, 344 (1964) (quoting Black's Law Dictionary (4th ed. 1957)), cert. denied, 380 U.S. 952, 85 S.Ct. 1085, 13 L.Ed.2d 969 (1965); Goodwin, Inc. v. Coe, 392 Mich. 195, 220 N.W.2d 664, 671 (1974).
 
 
 23
 Plaintiffs offer two forms of extrinsic evidence to demonstrate the alleged latent ambiguity in paragraph 23.
 
 
 24
 First, under the usage of trade clause of Article 2 of Michigan's Uniform Commercial Code, Mich.Comp.Laws Sec. 440.2202 (1986), plaintiffs argue that other reported decisions provide evidence that "Ford Motor routinely requires its dealers to execute a written release prior to effecting the buy-back." Citing Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885 (3d Cir.1975); Ray Dobbins Lincoln-Mercury, Inc. v. Ford Motor Co., No. 83-M-10-R (W.D.Va. Aug. 16, 1984), aff'd, No. 84-2299 (4th Cir. July 11, 1985) (per curiam); Grand Motors, Inc. v. Ford Motor Co., 564 F.Supp. 34 (W.D.Mo.1982); Schmitt-Norton Ford, Inc. v. Ford Motor Co., 524 F.Supp. 1099 (D.Minn.1981), aff'd mem., 685 F.2d 438 (8th Cir.1982). Usage of trade evidence tending to show Ford routinely requires a written release, in addition to any earlier release, plaintiffs contend, renders ambiguous paragraph 23's language even though it otherwise may be clear on its face.
 
 
 25
 And second, under the course of performance clause of Article 2, plaintiffs argue that from the time DLM resigned as a dealership, Ford continuously negotiated with DLM over its paragraph 23 claims. Plaintiffs offer as evidence four letters they wrote to Ford detailing their grievances and Ford's subsequent "comprehensive written reply to each of the matters or complaints" raised in the letters. This course of performance evidence, plaintiffs argue, shows that irrespective of what the face of paragraph 23 may seem to say, in actual dealings with DLM, Ford acknowledged the necessity for negotiation, even after DLM resigned its dealership and allegedly released Ford of all liability for claims arising under paragraph 23.
 
 
 26
 Plaintiffs' offer of extrinsic evidence to show a latent ambiguity in paragraph 23, however, is unavailing. Neither of plaintiffs' proffered proofs points up the existence of an ambiguity not apparent on the face of paragraph 23. First of all, the cases cited by plaintiffs to show that Ford routinely requires, as usage of trade, a written release before effecting an inventory buy-back are inapposite. Those cases cited by plaintiffs involved instances in which the dealers had executed written releases, but they did not purport to hold or demonstrate that those executions of written releases were necessary for the automatic release to be effective under paragraph 23. And second, Ford's continued negotiations with plaintiffs, as evidence of a course of performance negating the release of paragraph 23, is likewise unavailing. Without more, Ford's desire to communicate its position to plaintiffs on each of plaintiffs' claims does not, in our opinion, render ambiguous the otherwise clear release of liability mandated by paragraph 23 when DLM demanded benefits at the time of its resignation.
 
 3. Unconscionability
 
 27
 As a third argument, plaintiffs assert that even if paragraph 23 is clear in its imposition of a release of liability at the time a dealer resigns and demands benefits, the actual operation of paragraph 23 is "coercive and unenforceable." Although plaintiffs' argument in this respect is unclear, we believe the gist of plaintiffs' argument is that paragraph 23 is unenforceable because it is unconscionable. Paragraph 23 is allegedly unconscionable because it is a contract of adhesion and because DeValk agreed to its provisions unaware of Ford's tentative proposal to terminate one of the three dealerships serving the near northwest side of Chicago.
 
 
 28
 Michigan's courts define an adhesion contract in the usual sense of the term:
 
 
 29
 The essence of an adhesion contract is that it is offered on a take it or leave it basis to a consumer who has no realistic bargaining strength and who cannot obtain the desired services or goods without consenting to the contract terms.
 
 
 30
 Cushman v. Frankel, 111 Mich.App. 604, 314 N.W.2d 705, 707 (1981). The relative bargaining strength of the parties under Michigan law, however, is not the sole consideration. The Restatement (Second) of Contracts, with which Michigan's courts agree, explains:
 
 
 31
 A bargain is not unconscionable merely because the parties to it are unequal in bargaining position, nor even because the inequality results in an allocation of risks to the weaker party. But gross inequality of bargaining power, together with terms unreasonably favorable to the stronger party, may confirm indications that the transaction involved elements of deception or compulsion, or may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms.
 
 
 32
 Restatement (Second) of Contracts Sec. 208 comment d (1979); Muscat v. Lawyers Title Insurance Corp., 135 Mich.App. 26, 351 N.W.2d 893, 896 (1984); Allen v. Michigan Bell Telephone Co., 18 Mich.App. 632, 171 N.W.2d 689, 692 (1969).
 
 
 33
 Plaintiffs seem to argue that paragraph 23 of the Sales Agreements is unconscionable because it meets both prongs of the Restatement test. First, plaintiffs generally argue that any sales agreements between a dealer and Ford are marked by gross inequality in bargaining power. But in addition to the unequal bargaining positions, plaintiffs seem to contend that as to themselves paragraph 23's release provisions are substantively unreasonable. This argument seems to stem in part from plaintiffs' claim that "DeValk was not shown the dealer profile portion of the 1976 market study for Czarnowski L-M or otherwise advised of its contents relating to demographic trends or a possible reduction in the number of dealerships while in negotiations with Ford for approval of a franchise."
 
 
 34
 We are not persuaded, however, that paragraph 23 is unconscionable. Although it is true that the relative sizes, and perhaps bargaining powers, of Ford and any of its dealers are unequal, they are not grossly unequal. We note in this regard that DeValk is no neophyte in the automobile dealership business. He is a certified public accountant; he was executive partner of an accounting firm, which employed 80 persons in five offices. In that capacity he consulted automobile dealerships on accounting and business matters for over twenty years. In addition, DeValk was represented by counsel during the negotiations leading to DLM's receiving authorization as a Ford dealer.
 
 
 35
 Moreover, we agree with other courts that hold Ford is entitled to a valid exercise of its corporate power in offering dealers a choice of either electing benefits in exchange for a release of liability or of declining benefits altogether. See Fabert Motors, Inc. v. Ford Motor Co., 355 F.2d 888, 890-91 (7th Cir.), cert. denied, 384 U.S. 939, 86 S.Ct. 1462, 16 L.Ed.2d 539 (1966); Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885, 893-94 (3d Cir.1975); Ray Dobbins Lincoln-Mercury, Inc. v. Ford Motor Co., No. 83-M-10-R, slip op. at 4 n. 3 (W.D.Va. Aug. 16, 1984), aff'd, 813 F.2d 402 (4th Cir.1985) (per curiam); Grand Motors, Inc. v. Ford Motor Co., 564 F.Supp. 34, 39-41 (W.D.Mo.1982); Schmitt-Norton Ford, Inc. v. Ford Motor Co., 524 F.Supp. 1099, 1104-05 (D.Minn.1981), aff'd mem., 685 F.2d 438 (8th Cir.1982).
 
 
 36
 In this instance, we cannot say that the bargaining positions of the parties are grossly unequal and that the terms of paragraph 23 are substantively unreasonable. As a result, we hold paragraph 23 is not unconscionable.
 
 4. Waiver of Release of Liability
 
 37
 Plaintiffs argue finally that even if paragraph 23's release is unambiguous and enforceable, Ford has waived the release. Plaintiffs make this waiver argument along two lines.
 
 
 38
 First, plaintiffs contend Ford waived its right to rely on paragraph 23's release because it did not plead the release as an affirmative defense to plaintiffs' complaint as required by Rule 8. Fed.R.Civ.P. 8(c). As a general matter, plaintiffs are correct insofar as failure to plead an affirmative defense results in a waiver of that defense. Pinto Trucking Service, Inc. v. Motor Dispatch, Inc., 649 F.2d 530, 534 (7th Cir.1981). But when parties argue an affirmative defense in the district court, technical failure to plead the defense is not fatal. In a status report filed with the district judge on June 17, 1985, both DLM and Ford agreed that the release issue was one of the legal issues to be resolved. "While it would have been better housekeeping for defendant[s] to have requested an amendment, or for the trial court on its own motion to have ordered such, the rights of plaintiff[s] to a fair trial free from surprise were not violated. Plaintiff[s] knew of the issue and in a limited sense by implication consented." Mason v. Hunter, 534 F.2d 822, 825 (8th Cir.1976).
 
 
 39
 Plaintiffs argue Ford also waived the release in a second sense by negotiating with plaintiffs about their grievances after DLM submitted its resignation letter to Ford. If Ford truly was released of liability at the time DLM submitted its resignation, plaintiffs contend, then any subsequent efforts at negotiation by Ford constitute a waiver of the release.
 
 
 40
 Ford's response is that paragraph 27 of the Sales Agreements specifically provides there can be no implied waivers of any part of the Sales Agreements: "Except as expressly provided in this agreement, the waiver by either party, or the failure by either party to claim a breach, of any provision of this agreement shall not ... affect in any way the effectiveness, of such provision." We believe Michigan's courts would uphold such an "antiwaiver" clause,[2] and therefore conclude Ford did not waive its release.
 
 
 41
 Even if the release had been subject to waiver, however, Ford did not waive it here. The negotiations between Ford and DLM covered additional grievances other than those arising under paragraph 23 and hence the negotiations cannot serve as evidence of an implied waiver of paragraph 23's release.
 
 C. Paragraph 21(b) & 21(c) Claims
 
 42
 Aside from the claims arising under paragraph 23, a second set of claims arises under paragraphs 21(b) & 21(c). This second set of claims is not subject to paragraph 23's release of liability. Rather, these claims are specifically exempted from the release. Paragraph 23 releases all liability, "except any liability that the Company may have under subparagraph 19(f) and said paragraphs 21 and 22."Although the paragraph 21(b) & 21(c) claims are not subject to paragraph 23's release, they are subject to a mediation clause. The mediation clause, found in paragraph 18(b) of the Sales Agreements, provides:
 
 
 43
 Any protest, controversy or claim by the Dealer (whether for damages, stay of action or otherwise) with respect to any termination or nonrenewal of this agreement by the Company or the settlement of the accounts of the Dealer with the Company after any termination or nonrenewal of this agreement by the Company or the Dealer has become effective, shall be appealed by the Dealer to the Policy Board within fifteen (15) days after the Dealer's receipt of notice of termination or nonrenewal, or, as to settlement of accounts after termination or nonrenewal, within one year after the termination or nonrenewal has become effective. Appeal to the Policy Board shall be a condition precedent to the Dealer's right to pursue any other remedy available under this agreement or otherwise available under law. The Company, but not the Dealer, shall be bound by the decision of the Policy Board. (emphasis added)
 
 
 44
 The mediation clause is straightforward. It requires DLM to appeal any "protest, controversy or claim" it has with Ford to the Dealer Policy Board. The mediation clause further specifies that the "[a]ppeal to the Policy Board shall be a condition precedent to the Dealer's right to pursue any other remedy ... available under law."
 
 1. Substantial Performance
 
 45
 Plaintiffs concede they did not appeal their dispute with Ford to the Dealer Policy Board. But plaintiffs contend their failure to take the appeal is not fatal to their claims under paragraphs 21(b) & 21(c) because they "substantially complied" with the mediation clause's requirements.[3] Plaintiffs base this contention on their view of the underlying purpose of the mediation clause: "It must be inferred that the purpose of requiring an appeal to the Dealer Policy Board is to give Ford Motor notice of any potential claim the dealer may have with respect to matters covered under paragraph 18(b) and to allow Ford Motor an opportunity to attempt to settle the claim prior to litigation." Plaintiffs argue that their post-resignation actions fulfill this two-pronged purpose of the mediation clause, and thus represent substantial compliance with its requirements, even though an appeal was not taken to the Dealer Policy Board.
 
 
 46
 Plaintiffs believe they fulfilled the first alleged purpose of the mediation clause by writing four letters to Ford detailing DLM's grievances. Plaintiffs argue these letters gave Ford all the notice it needed of the claims with which plaintiffs were concerned.
 
 
 47
 As for the second alleged purpose of the mediation clause, plaintiffs contend they presented Ford with ample opportunity to settle their claims prior to litigation. The negotiations between plaintiffs and Ford's representatives spanned over eight months. Both Ford and plaintiffs effectively articulated their respective positions during these negotiations. Plaintiffs argue this negotiation process fulfilled the purpose of allowing Ford to attempt to settle its claims with DLM.
 
 
 48
 Although it is true that "Michigan follows the substantial performance rule," P & M Construction Co. v. Hammond Ventures, Inc., 3 Mich.App. 306, 142 N.W.2d 468, 473 (1966) (citation omitted), and that in Michigan "the extent of nonperformance [is] viewed in relation to the full performance promised," Gordon v. Great Lakes Bowling Corp., 18 Mich.App. 358, 171 N.W.2d 225, 228-29 (1969), we cannot agree with plaintiffs' contention.
 
 
 49
 As an initial matter, we hesitate to apply the substantial performance rule outside the realm of cases in which that rule is applied in Michigan. The substantial performance rule in Michigan allows contractors, engineers, builders, and other construction professionals to recover a proportionate share of a contractual sum when they have substantially performed their construction obligations. See, e.g., Antonoff v. Basso, 347 Mich. 18, 78 N.W.2d 604 (1956); McCall v. Freedman, 35 Mich.App. 243, 192 N.W.2d 275 (1971). Outside of those construction-type cases, however, we are unable to find any evidence that Michigan's courts are willing to more broadly apply the substantial performance rule. Cf. Gordon v. Great Lakes Bowling Corp., 18 Mich.App. 358, 171 N.W.2d 225, 228-29 (1969) (applying substantial performance rule to lease dispute, but in addition to rent, parties argued over construction costs and construction delay).
 
 
 50
 Even if we were confident that Michigan's courts would apply the substantial performance rule to a wider variety of contractual disputes, we would not apply the rule here. Although the substantial performance rule in Michigan seems to derive in part from the maxim, "The law abhors a forfeiture," we are convinced it applies only in the absence of conditions precedent. E.g., Knox v. Knox, 337 Mich. 109, 59 N.W.2d 108, 112 (1953) ("While parties to a contract may by specific provision, or by necessary implication, make performance by one party a condition precedent to liability on the part of the other, courts are not disposed, in the absence of specific provisions or reasonable implications, to give such construction to an agreement, especially if so doing brings about an unfair result."); Kachanowski v. Cohen, 305 Mich. 438, 9 N.W.2d 667, 668 (1943) ("The law is well settled that one who executes a contract may protect himself from liability by a distinct agreement that it shall not become operative until there has been compliance with certain conditions thereof.").
 
 
 51
 The mediation clause here states that it is a condition precedent to any litigation. As a result, the clause takes itself outside the sphere of influence of the substantial performance rule. Because the mediation clause demands strict compliance with its requirement of appeal to the Dealer Policy Board before the parties can litigate, plaintiffs' substantial performance arguments must fail.
 
 2. Waiver of Mediation Clause
 
 52
 Undaunted, plaintiffs argue that even if the mediation clause operates as a condition precedent to litigation, Ford waived the requirements of that clause by its conduct following the final date on which an appeal could be taken to the Dealer Policy Board. The mediation clause requires the dissatisfied dealer to appeal its claims to the Dealer Policy Board "within one year after the termination or nonrenewal has become effective." Ford accepted DLM's resignation and DLM ceased operations in October 1979. Therefore, any continuing negotiations between DLM and Ford after October 1980, plaintiffs argue, constitute a waiver by Ford of the requirements of the mediation clause. As evidence of such continuing negotiations, plaintiffs point to a letter from Ford dated December 1980, an unpaid credit reflected in June 1981, and a claimed reduction in unpaid credit in October 1985; all three items addressing credits to DLM's parts account with respect to the repurchasing of parts by Ford.
 
 
 53
 Initially, we note that "a waiver of a breach of contract must be a 'voluntary, intentional relinquishment of a known right.' " Bissell v. L.W. Edison Co., 9 Mich.App. 276, 156 N.W.2d 623, 627 (1967) (quoting Don-Ray Tool & Die, Inc. v. John Hancock Mutual Life Insurance Co., 5 Mich.App. 263, 146 N.W.2d 139, 142 (1966)). We then ask, under Michigan law, what evidence is necessary to show the relinquishment of the right? The Supreme Court of Michigan has explained that "[a] waiver may be shown by proof of express language of agreement or inferably established by such declarations, acts, and conduct of the party against whom it is claimed as are inconsistent with a purpose to exact strict performance." Strom-Johnson Construction Co. v. Riverview Furniture Store, 227 Mich. 55, 198 N.W. 714, 718 (1924). So the waiver can be express, or it may be inferred from the conduct of the nonbreaching party. Specifically, the conduct giving rise to an inference of waiver may take the form of continued performance by the breaching party without any attempt by the non-breaching party to call a halt to the performance. The Supreme Court of Michigan noted in another case that " '[i]t was the appellant's duty, when it discovered the apparent breach of the contract, if it intended to insist upon a forfeiture, to do so at once. By permitting appellees to proceed with the performance of the contract it waived a breach.' " Schnepf v. Thomas L. McNamara, Inc., 354 Mich. 393, 93 N.W.2d 230, 232 (1958) (quoting Grayson-McLeod Lumber Co. v. Slack-Kress Tie & Stave Co., 102 Ark. 79, 143 S.W. 581, 583 (1912)); accord Barton v. Chemical Bank, 577 F.2d 1329, 1337 (5th Cir.1978) ("[A] party standing silent while the other party to the contract fails to perform a condition will be estopped from later asserting the condition.").
 
 
 54
 In this regard, plaintiffs point us to the law of arbitration clauses as a closely analogous area of contractual agreement by which we should be guided. The Supreme Court of Michigan has held that an insurer "may waive the compulsory arbitration provision of its insurance policy by its conduct." Bielski v. Wolverine Insurance Co., 379 Mich. 280, 150 N.W.2d 788, 790 (1967). That court also explained:
 
 
 55
 "A clause in an insurance policy providing for arbitration or appraisal of the loss or damage as a condition precedent to a suit by the policyholder to recover insurance is inserted wholly for the protection of the insurer and may be waived by it. Such waivers need not be expressed in terms, but may be implied by the acts, omissions, or conduct of the insurer or its agents authorized in such respect."
 
 
 56
 Id. (quoting 29A American Jurisprudence Insurance Sec. 1617 (1960)); Capital Mortgage Corp. v. Coopers & Lybrand, 142 Mich.App. 531, 369 N.W.2d 922, 924 (1985).
 
 
 57
 Superficially, it appears that Ford's conduct after the time expired for an appeal to the Dealer Policy Board possibly constitutes a waiver. And we might find persuasive plaintiffs' arguments in this regard were it not for Ford's response, with which we agree, that Michigan's courts uphold anti-waiver clauses. Because DLM agreed in paragraph 27 of the Sales Agreements that implied waivers of Sales Agreements' provisions would not be permitted, plaintiffs' waiver argument cannot stand.
 
 
 58
 3. Repudiation for Material Breaches of Contract
 
 
 59
 In a final effort to skirt the requirements of the mediation clause, plaintiffs argue that Ford's alleged material breaches of the Sales Agreements relieved DLM of any duty to appeal its grievances to the Dealer Policy Board.
 
 
 60
 Ford argues, however, that plaintiffs did not raise this repudiation argument in the district court and they thus waive it on appeal. Our review of the record, and plaintiffs' failure in their reply brief to counter Ford's charge, persuade us that indeed this argument was not raised in the district court. It is thus waived on appeal. See Zbaraz v. Hartigan, 763 F.2d 1532 (7th Cir.1985); Textile Banking Co. v. Rentschler, 657 F.2d 844, 853 (7th Cir.1981).
 
 IV. CONCLUSION
 
 61
 Even after drawing all the reasonable inferences in favor of plaintiffs' positions on this appeal from an adverse grant of summary judgment, we cannot find any genuine issues of material fact. Because there are no such issues, the judgment granted to defendants by the district judge as a matter of law is
 
 
 62
 AFFIRMED.
 
 
 
 [1]
 To be sure, other cases wrestle with paragraph 23 of the standard Ford Sales Agreement, and its predecessors, but none of them decide whether, in the absence of a written release, Ford is nevertheless released from liability to a dealer at the time the dealer demands benefits. E.g., Fabert Motors, Inc. v. Ford Motor Co., 355 F.2d 888 (7th Cir.), cert. denied, 384 U.S. 939, 86 S.Ct. 1462, 16 L.Ed.2d 539 (1966); Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885 (3d Cir.1975); Grand Motors, Inc. v. Ford Motor Co., 564 F.Supp. 34 (W.D.Mo.1982); Schmitt-Norton Ford, Inc. v. Ford Motor Co., 524 F.Supp. 1099 (D.Minn.1981), aff'd mem., 685 F.2d 438 (8th Cir.1982)
 
 
 [2]
 We do note, however, that in at least some limited circumstances Michigan's courts will hold "that an 'anti-waiver' clause, like any other term of the contract, [is] itself subject to waiver or modification." Formall, Inc. v. Community National Bank, 138 Mich.App. 588, 360 N.W.2d 902, 905 (1984) (quoting Westinghouse Credit Corp. v. Shelton, 645 F.2d 869, 873-74 (10th Cir.1981)). Because these circumstances seem to be limited by Michigan's courts to anti-waiver clauses in credit notes held by financial institutions, we are reluctant to extend the possibility of waiver of an anti-waiver clause to this contractual dispute
 
 
 [3]
 Based on this language of the mediation clause, Ford contends it is released from any liability that may have arisen under paragraphs 21(b) & 21(c). Moreover, Ford asserts that DLM's argument with respect to substantial performance was waived on appeal because DLM did not raise the argument in the district court. Apparently, Ford is sufficiently convinced of the strength of its waiver argument that it believes it does not need to address DLM's contentions on the merits with any degree of thoroughness. Indeed, Ford fails to cite to us a single case to refute DLM's arguments on the merits for this point and others. (In fairness to Ford, plaintiffs as well did not cite any authority for this and other arguments.)
 Unfortunately, we cannot agree with Ford's waiver argument. It is true that arguments not raised in the district court are waived on appeal. E.g., Zbaraz v. Hartigan, 763 F.2d 1532, 1544 (7th Cir.1985); Textile Banking Co. v. Rentschler, 657 F.2d 844, 853 (7th Cir.1981). But DLM did raise this argument in the district court. In DLM's "Statement of Genuine Issues to be Tried and Facts Relating to Those Issues," (docketed Nov. 18, 1985), DLM raised as its tenth issue: "Ford does not require its dealers to seek relief from its Dealer Policy Board in order to bring claims in a judicial forum." In support of that issue, DLM stated as a fact: "A member of the Dealer Policy Board from 1979 through 1981 has testified that dealers may seek adjustments of their grievances with the Dealer Policy Board, but they are not required to do so."
 More important, DLM raised the argument a little more clearly in its "Memorandum in Opposition to Motion for Summary Judgment," (docketed Nov. 19, 1985), the principal paper filed by a non-movant in a summary judgment proceeding. DLM asserted: "Ford either has a policy not to consider relief before the Dealer Policy Board as mandatory or has waived any such requirement."
 We believe these allegations are sufficient to overcome Ford's claim that DLM's argument was not raised in the district court and hence is waived on appeal.