**Patrick CONROY and Patricia Conroy, Plaintiffs,**

**v.**

**VILLAGE OF LISLE, Defendant.**

**No. 88 C 2850.**

United States District Court, N.D. Illinois, E.D.

July 12, 1989.

Matthew M. Klein, Schain, Firsel & Burney, Ltd., Chicago, Ill., for plaintiffs.

Richard T. Ryan, Mark F. Smolens, Flynn, Murphy & Ryan, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Patrick and Patricia Conroy ("Conroys") have filed a three-count Complaint against the Village of Lisle ("Village")—purportedly under the Fifth Amendment,[1] the Fourteenth Amendment and 42 U.S.C. § 1983 ("Section 1983")[2]—alleging:

---

1. As always, this opinion will adhere to the conventional and convenient (though technically imprecise) practice of referring to the Fifth Amendment's underlying Just Compensation Clause (which of course imposes limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties).

2. Though Conroys' counsel thus did not draft the Complaint in the manner suggested in this footnote, clearly any claimed constitutional violation would be actionable (if at all) under Section 1983—there is no independent right to sue directly on a constitutional claim against state actors, as may be done with *Bivens*-type constitutional complaints assertable against federal officials.

1. Village took Conroys' property (the "Property," located at 732 Riedy Road) without just compensation in violation of the Fifth Amendment (Count I).

2. Village deprived Conroys of their property under color of state law in violation of Section 1983 (Counts II and III). This Court's July 8, 1988 oral ruling (a) dismissed Count I for failure to state a currently viable claim but (b) confirmed that the Section 1983 counts sufficiently alleged a denial of substantive due process to withstand such dismissal.

After minimal discovery both sides moved for summary judgment on the remaining counts. For the reasons stated in this memorandum opinion and order, Village's motion is granted, Conroys' is denied and this action is dismissed.

### Factual Background [3]

In 1963 Donald Espersen and his wife Kathryn ("Espersens") acquired property located on Riedy Road in the Village of Lisle, part of a 1950 subdivision laid out in 100–foot–frontage lots.[4] Village's later-enacted zoning ordinance (adopted in 1970) classified the property as single-family residential and established a minimum frontage requirement of 75 feet for a buildable lot under its Section 5–4–3(C) ("Ordinance § 5–4–3(C)").

Espersens' 150 feet of frontage thus qualified for division into two buildable lots, under Village's ordinance. Nonetheless, when in 1974 they contemplated resubdividing their property and then selling the east portion (using the west portion to build a home for themselves), they investigated the possibility of acquiring the 50 feet adjoining their property to the east (the east half of Lot 11, now the subject of this litigation—the "Property") from its then owner, Janina Pietraszewski ("Pietraszewski") (D.Ex.F).[5] That of course would have enabled the total combined properties of 200 front feet to be developed with two more-than-minimum-frontage lots, conforming exactly to the original subdivision plat.

3. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987)). Where as here cross motions are involved, that principle demands a dual perspective that sometimes causes the denial of both motions. In this instance no such potential problem exists:

  1. Conroys' response to Village's motion specifically confirms that the latter's Statement of Uncontested Facts is indeed uncontroverted.

  2. Conroys do tender some added evidentiary materials (principally an affidavit from Patrick Conroy) in support of their own motion. And Village's response does assert the potential for factual disputes—including items subject to further discovery—on a host of Conroy's added assertions (an odd notion, given the place that summary judgments are supposed to play as the last act in the litigation drama, replacing a trial only because there are no material facts requiring resolution and therefore only issues of law remain). But the critical point is one Village does not make in its response—and perhaps does not recognize: None of the matters that Conroys raise and Village suggests it might contest are

*material*—that is, outcome-determinative (see *In re Wildman,* 859 F.2d 553, 556 (7th Cir. 1988) and cases cited there).

4. That subdivision was the Arthur T. McIntosh and Company's Lisle Countryside Unit Number 1 ("McIntosh Subdivision"). Espersens' initial (and only) purchase comprised all of Lot 12 in Block 3 of the McIntosh Subdivision plus the west half of Lot 11 (lying immediately east of Lot 12)—thus fronting 150 feet on Riedy Road (P.Ex. 5). Even though their own exhibit confirms that fact, Conroys' counsel distorts the record in that respect (P.Mem. 3):

  The west half of Lot 11 was purchased in 1963 by the Espersens, who owned the adjoining property to the west. Eleven years later in 1974, the Espersens sought to combine their existing 100-foot lot with the 50–foot west half of Lot 11 and divide the resulting 150–foot property into two 75-foot lots.

It is impossible to tell just how much of Conroys' and their lawyers' seriously skewed approach to the law stems from their obvious misunderstanding of the facts.

5. According to Village's Zoning Board of Appeals ("Zoning Board") minutes reflecting Pietraszewski's later request (filed in 1976) for a variance to permit her to build on the Property (D.Ex. E), Pietraszewski said she had bought the Property a few years earlier without realizing it was a nonbuildable lot under the zoning ordinance.

When Pietraszewski asked more than Espersens were willing to pay for the Property, Espersens promptly proceeded (as was permitted under Village's zoning ordinance) to seek and to obtain a resubdivision of their property into two buildable lots, each with 75 feet of frontage. Something less than two years later Pietraszewski applied unsuccessfully for a variation to permit her to build a single-family residence on her own undersized Property (see n. 5).

In 1978 Conroys entered the picture when Pietraszewski sold them the Property for $5,500 (her original purchase price, see D.Ex.E).[6] Conroys were not new to Village—not only did they live there, but they had previously bought four other lots in Lisle and had built houses on all four. All those other lots were 50–foot lots too, but each of them (unlike the Property) was a legal nonconforming lot that had been platted as a full lot (not, like the Property, as just half of a platted lot) before enactment of the zoning ordinance (Conroys Mem. 4).

Nothing more happened until 1985, when Conroys decided they wanted to build on the Property. They applied for a building permit, which was approved on October 14, 1985 by Community Development Director/Building Commissioner Thomas F. Ewers ("Ewers")—apparently both Ewers and Conroys were blissfully unaware that such construction was illegal because of Section 5–4–3(C) and because the Property was not exempt from its operation (that is, the Property was not a preordinance legal nonconforming lot). Conroys proceeded to dig a big hole in the ground. Reality came crashing in a week later, however, when Ewers realized his error and suspended the permit.

At that point Conroys sought a variance (an exemption from the applicability of Ordinance § 5–4–3(C) to the Property). At the conclusion of its January 16, 1986 public hearing on that application, the Zoning Board recommended denial of the variance to Village's Board of Trustees (D.Ex.A). On February 17, 1986 the Board of Trustees did just that (under Illinois law the power to grant variances is vested in the municipality's governing body, so the Zoning Board's action was purely advisory and recommendatory). Rather than seeking review of those decisions in the state courts, Conroys filed this action on April 4, 1988.[7]

### Section 1983 Analysis

Any Section 1983 liability on Village's part hinges on Conroys' ability to show they were deprived of a constitutional right under color of state law. Of course the "color of state law" component poses no difficulty where, as here, the claimed offender is a municipal corporation. But Conroys have not clearly articulated the constitutional rights allegedly infringed by Village.

One potential candidate might be the Just Compensation Clause of the Fifth Amendment, to the extent it may be deemed incorporated by the Fourteenth Amendment—at least Complaint Count II ¶ 16 might arguably be read that way, and Conroys Mem. 6–7 cites to some precedents applying the Just Compensation Clause. But any claim pegged in those terms must fail on at least two grounds:

1. As this Court ruled in dismissing Count I, any such federal "taking" claim cannot be lodged where a state provides an adequate procedure for seeking just compensation and where the property

6. Conroys originally answered an interrogatory identifying 1975 as their date of purchase. That however does not jibe (1) with Pietraszewski's ownership of the Property in 1976 when she applied for her own variance or (2) with Conroys' counsel's representations to the Zoning Board, made when Conroys applied for their variance in 1986 (D.Ex.A). In any event, the litigants have now concurred in treating 1978 as the correct date.

7. Although this Court (among others) views the limitations question under Section 1983 as an open issue (see *Doe v. Calumet City*, 707 F.Supp. 343 (N.D.Ill.1988)), our Court of Appeals has often repeated—albeit without analysis—the assumption that there is a two-year statute of limitations for such actions. On that premise this action would have been untimely (more than two years had elapsed between the February 17, 1986 Village Board action and the filing of this lawsuit), but Village has waived that potential affirmative defense by not raising it.

owner has not utilized that procedure (*Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 194–95, 105 S.Ct. 3108, 3120–21, 87 L.Ed.2d 126 (1985)). Like most states, Illinois provides just such an "inverse condemnation" procedure in cases such as this one (see, e.g., *Chef's No. 4, Inc. v. City of Chicago,* 117 Ill.App.3d 410, 73 Ill.Dec. 67, 453 N.E.2d 892 (1st Dist.1983)). Conroys did not pursue that route, and that is just as fatal to any Count II claim based on a "taking" theory as it was to their Count I claim.

■ 2. Village never "took" anything from Conroys. They bought the Property with the zoning ordinance already in place. They do not and cannot claim a 75-foot frontage requirement is inherently invalid, and they must be viewed as having acquired the Property cum onere. By its terms the Just Compensation Clause applies only to the taking of "property," and Conroys' claimed deprivation of rights cannot fit within that description. They never *had* any right to build a residence on the Property that was somehow "taken" by the zoning ordinance.[8]

■ If Conroys are to succeed, then, it can only be via the Due Process Clause. In that respect they acknowledge they are not leveling a total challenge to the validity of Ordinance § 5–4–3(c) (Conroys Mem. 1). Instead they dispute its applicability to the Property—contending that the denial of their requested variance violated their substantive due process rights.

On that score *Burrell v. City of Kankakee,* 815 F.2d 1127, 1129 (7th Cir.1987) (citing *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974)) puts the legal standard in these terms:

> Thus, in order to prevail on a substantive due process claim, plaintiffs must allege and prove that the denial of their proposal is arbitrary and unreasonable bearing no substantial relationship to the public health, safety or welfare.

And *Coniston Corp. v. Village of Hoffman Estates,* 844 F.2d 461, 467 (7th Cir. 1988) is even more blunt:

> This case presents a garden-variety zoning dispute dressed up in the trappings of constitutional law—a sure sign of masquerade being that the plaintiffs do not challenge the constitutionality of the zoning ordinances of the Village ... but argue rather than [sic—should be "that"] the Board of Trustees had no authority under those ordinances to reject their site plan once the Village Plan Commission had approved it.

That principle applies with equal force to the challenge Conroys launch here to the denial of their requested zoning variance by Village's Board of Trustees. And *Coniston, id.* goes on to hold such an *individual* zoning decision denies substantive due process only if it is "invidious or irrational."

Faced with such a high hurdle, Conroys attempt an end run around it to avoid having to leap it. Again they distort the record (Conroys Mem. 1):

> Simply stated, this case presents the question of whether a municipality which divides land in such a way as to create a non-conforming lot under that municipality's zoning ordinance, may under the guise of enforcing its zoning ordinance prevent a purchaser of that lot from making any economically viable use of the property.

"Simply stated," that is not the question at all. It was not *Village* that divided Lot 11 "in such a way as to create a nonconforming lot," but rather private persons in a private transaction. It does not appear from the record whether that first took place when Espersens' predecessors in title (a Mr. and Mrs. Buchholz, P.Ex. 5) sold Lot 12 and the west half of Lot 11 to the Espersens, perhaps retaining ownership of the Property, or whether the splitting up of Lot 11 had taken place at some earlier date (so that the Buchholzes never owned the

---

**8.** Conroys have pointed to no case, nor has this Court found any, where a taking was found in such a situation. Because the constitutional guaranty of just compensation extends only to "property," under the case law a "taking" always involves the *new* imposition of a previously nonexistent restriction, whether via a zoning enactment or some other means. Indeed, that is true of every single case on which Conroys seek to rely (Conroys Mem. 6–8).

Property). But it does not matter either way, for the fact remains that the Property's nonconformity with the 75–foot requirement cannot be laid at Village's door.

Nor are Conroys persuasive in equating Village's approval of Espersens' resubdivision of *their own* property (including the west half of Lot 11) with a simultaneous tacit approval of the other half of Lot 11—the Property—as a buildable lot. If Village had instead turned down Espersens' application, Espersens would have had to limit their construction to a single residence on the 150 feet of frontage they then owned. Whoever at any time owned the 50 feet of frontage constituting the Property—whether Conroys or anyone else—then would have had the same nonbuildable parcel that now exists. And the Property's owner (whether Conroys or anyone else) cannot complain because Village did allow Espersens' 150 feet of frontage to be broken up into two lots, each of which conformed to the ordinance's 75–foot minimum requirement. No due process considerations are involved in Village's having given building rights in the past to different owners (Espersens) whose property *did* qualify for building rights, while now denying those rights to the plaintiff owners (Conroys) whose property *does not* qualify.

To recast the matter a bit differently in due process terms, Illinois state law does not impose on a zoning authority any affirmative duty to police the condition of title and the ownership of all other property in the area when a particular parcel is presented for consideration by the zoning authority. Instead the matter is left to the free market—every property owner, and every prospective buyer such as Conroys, has the legal burden of knowing or learning the status and potential utilization of his, her or their property under its existing zoning. And in the language of the test made applicable to any such state rule of law when challenged in a federal court under Section 1983, there is no way in which that legal principle can be labeled as "invidious" or "irrational" or "arbitrary"—or anything even approaching any of those pejorative adjectives.

**9.** Of course Conroys cannot argue that because

Thus Conroys' basic attack on Village is bankrupt at its core. It remains only to address the other arguments advanced in Conroys' memorandum.

They first contend they have been denied any reasonable use of their land. To be sure, the zoning ordinance prevents Conroys from erecting any private building on the Property (Ewers Dep. 23–24)—essentially it is usable only for recreational purposes. But that is equally true of every parcel in a single-family residence district that lacks the required frontage—and Conroys do not purport to challenge such a requirement in global terms. Indeed they cannot do so, for as *Belle Terre*, 416 U.S. at 9, 94 S.Ct. at 1541 says:

> A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs. This goal is a permissible one within *Berman v. Parker*, [348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954)].

Such a minimum lot frontage requirement, like the height restriction in *Albery v. Reddig*, 718 F.2d 245, 251 (7th Cir.1983), "is a matter almost classically within the scope of the police power" and "without any question a matter of peculiarly local concern." As such, "it is not so irrational or unrelated to public needs as to implicate the Fourteenth Amendment" (*id.*).

That analysis necessarily also dooms Conroys' argument that the application of the general ordinance requirement to them—that is, Village's unwillingness to depart from its uniform application of that requirement by granting a variance—somehow violates due process either. No serious consideration can be given to the proposition that Village's decision to enforce a concededly rational zoning regulation in accordance with its terms, and in a nondiscriminatory manner, is somehow itself irrational.[9] *Harding v. County of Door*, 870 F.2d 430, 432 (7th Cir.1989) sustained the public authorities' action against Section 1983 attack in these terms:

> Plaintiff also contends that the Board's decision itself [a decision revoking a

they were previously *unaware* of any zoning

building permit] was irrational. This argument too, is without merit. The record reveals that the Board rendered a reasoned decision based on a perfectly logical interpretation of the relevant zoning ordinance.

That might have been written for this case, and the same result follows here.[10]

In sum, nothing in this case renders Village's denial of Conroys' variance request a constitutional violation (see *Burrell,* 815 F.2d at 1129). *Coniston,* 844 F.2d at 467 (citation omitted) has said:

> much governmental action is protectionist or anticompetitive ... and nothing is more common in zoning disputes than selfish opposition to zoning changes. The Constitution does not forbid government to yield to such opposition; it does not outlaw the characteristic operations of democratic (perhaps of any) government, operations which are permeated by pressure from special interests.

If that is so, the same reasoning must apply a fortiori to Village's governmental refusal to yield to Conroys' selfish opposition to zoning *enforcement,* not to zoning *changes.*

This Court is not a zoning board of appeal, let alone a super-Trustee for Village

restriction (as they say they were), the imposition of that restriction on them somehow violated due process. Whether in support of that untenable notion or for some other reason, they certainly make a fuss about their prior ignorance. But ignorance of zoning ordinances does not affect their validity or enforceability—Conroys "must be presumed to have acted with knowledge of the applicable zoning laws and restrictions." *Albery,* 718 F.2d at 251 expressly relied upon that presumption as a basis for rejecting the contention that the denial of a variance in that case represented a denial of due process to the affected property owners.

10. Conroys Mem. 8–9 urges the denial of their variance was intended to discourage others from following suit in violating the ordinance's lot size requirements. Even if that is assumed to have been the case (it is based on Ewers' deposition characterization of why he thought the Zoning Board and Village's Trustees had acted, not on anything they themselves had said), it is more than a bit odd to call *that* an irrational decision. If anything, such a desire on Village's part to assure uniform adherence to

(*Harding,* 870 F.2d at 432). It really does not matter why Conroys originally bought the Property or why they waited to implement any plans to seek its development. They cannot shift the burden for their lack of vigilance or diligence [11] onto Village.

There is no genuine issue of material fact, and Village is entitled to a judgment as a matter of law. This action is dismissed.

a rational frontage requirement also demonstrates the rationality of the decision fueled by that desire—and mere rationality is all that needs to be found by this Court (see *Clark v. County of Winnebago,* 817 F.2d 407, 409 (7th Cir.1987)).

11. There is simply no excuse for anyone investing even such a modest amount as $5,500 in real estate without apprising himself or herself of how that property is zoned and what restrictions limit its use (though this opinion has, as it must on Village's Rule 56 motion, accepted Conroys' profession of ignorance on that score). But if anyone does so, he or she must live with the consequences if any of the unexamined assumptions in those respects prove unfounded. Speculation in commercial transactions is perfectly acceptable (there was even an ongoing traffic in Czarist rubles for many years after the 1917 Russian revolution), but Conroys would not have shared with Village any profits they would have realized had their gamble proved successful. They cannot legitimately expect to be relieved of the full burden of that gamble when it has turned out to be a loser.