NOT RECOMMENDED FOR PUBLICATION
File Name: 05a0547n.06
Filed: June 24, 2005

**No. 04-1445**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

INNOVATIVE CASE, INC.

      **Plaintiff-Appellee,**

v.

TWEDDLE LITHO CO.

      **Defendant-Appellant.**

                                         /

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN**

**BEFORE:**     DAUGHTREY and CLAY, Circuit Judges; GRAHAM, District Judge.[*]

      **CLAY, Circuit Judge.** This state law contract dispute is before this Court pursuant to diversity jurisdiction, 28 U.S.C. § 1332. Defendant, Tweddle Litho Company ("Tweddle"), appeals from the district court's grant of summary judgment to Plaintiff, Innovative Case, Incorporated ("Innovative"). The parties agree that this case is governed by Michigan law, including Michigan's adoption of the Uniform Commercial Code ("U.C.C.") *See* M.C.L. § 1101, *et seq.*.

      This case centers on Tweddle's rejection of 28,000 leather portfolios supplied by Innovative pursuant to a contract between the parties. When Innovative sued to recover the contract price of

---

      [*]The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

the rejected portfolios, Tweddle pointed to two alleged defects in the portfolios as justification for its rejection. The district court determined that Tweddle had waived its right to rely on the first alleged defect and had failed to make any showing that the second defect existed, except with respect to nineteen of the 28,000 portfolios. The district court therefore granted summary judgment to Innovative, and ordered Tweddle to pay damages, interest, and costs in the amount of $219,141.34. For the reasons that follow, we **AFFIRM** the district court in all respects.

## BACKGROUND

I. **Facts**

Innovative, an Illinois corporation with its principal place of business in Illinois, imports cases of various kinds, including leather portfolios, which are manufactured overseas for Innovative, and supplies them to customers in the United States. Tweddle is a printing company incorporated in Michigan, with its principal offices in Michigan. This case arises from an agreement between the two parties that Innovative would supply Tweddle with leather portfolios for use in glove box kits that Tweddle, in turn, supplied to the Ford Motor Company.

Tweddle began supplying glove box kits for Lincoln vehicles to Ford Motor Company in 2000. Previously, Ford had purchased portfolios directly from The Beanstalk Group. Tweddle had agreed to continue to purchase portfolios from The Beanstalk Group "as a pass-through," that is, without marking up the price The Beanstalk Group charged for the portfolios. Thus, any profit Tweddle made on the glove box kits while using The Beanstalk Group as a supplier on a pass-through basis came from the other components of the kit.

Despite that arrangement, in approximately the middle of 2001, representatives of Tweddle were introduced to David Schafer ("Schafer"), the owner of Innovative. At an initial meeting, Innovative was given a sample of a black leather Lincoln portfolio, manufactured by The Beanstalk Group. Innovative's supplier in China, Palibon Leather Products Company, Ltd. ("Palibon") then manufactured sample portfolios, based on the portfolio provided by Tweddle to Innovative, which were presented to and approved by Tweddle.

On October 22, 2001, Tweddle issued a purchase order to Innovative for 50,000 leather Lincoln portfolios for $7.46 each. The purchase order noted "payment is based upon a successful inspection of product by Tweddle Litho and that the product is identical to a sample provided by Innovative Case that Tweddle Litho has approved." The purchase order also contained the following inspection clause: "Tweddle Litho Company . . . shall be afforded the right to verify at the source that the purchased product conforms to the specified requirements . . . Such verification shall not be used as evidence of effective control of quality. Verification by the Tweddle Litho Company shall not absolve the Seller of the responsibility to provide acceptable product, nor shall it preclude subsequent rejection by the Tweddle Litho Company." The purchase order was drafted by Eric Taylor of Tweddle.

Subsequently, at Tweddle's request, Innovative submitted a specifications sheet to Tweddle detailing "material specifications for the Lincoln Portfolio." The "spec sheet" does not specify the depth of embossing of the Lincoln name and logo. There is no evidence on the record that Tweddle made any objection to the spec sheet.

3

David Schafer signed the purchase order on January 23, 2002. Innovative arranged for the portfolios to be produced by Palibon. Schafer stated in an affidavit that he "understood that the Purchase Order provided for a single inspection which, in accordance with standard industry practice, would occur in China before the portfolios were shipped. Standard industry practice is that goods are inspected overseas and accepted before shipment." In contrast, Taylor, Tweddle's purchasing agent, testified that he asked Jerry See-Tow ("See-Tow"), director of Tweddle's Singapore office, to arrange an inspection, and that "typically the initial inspections over in China are pre-ship inspections to make sure there are no gross errors in the product or gross defects in the product."

See-Tow retained Bureau Veritas Consumer Product Services ("Bureau Veritas") to inspect the portfolios. According to Jack Wong ("Wong"), Palibon's owner and president, See-Tow attended the inspection with a representative of Bureau Veritas and spent time in the inspection room comparing production portfolios to the approved sample. Wong's affidavit also states that See-Tow authorized him to complete production and ship the portfolios, and indicated that no further inspection was necessary.

The Bureau Veritas inspection report, dated April 6, 2002, which was sent to See-Tow, notes that "[t]he hot stamping of 'Lincoln' logo was not as deep as that against the client's approved sample." The inspection report also indicates that "the inspection findings comply with acceptance criteria. It is concluded that the shipment is considered as conformance with Tweddle Litho's requirement." Bureau Veritas' inspection report contains the following note: "The above reflects our findings at the time and place of inspection. This report does not relieve sellers/suppliers from

their contractual responsibilities with regard to quality/quantity of this delivery nor does it prejudice buyers' right of claim towards sellers/suppliers for compensation for our random inspection or occurring thereafter."

The inspection report's observation about the light embossing is also made in Bureau Veritas' inspection data sheet. Schafer stated in his affidavit that Wong faxed him a copy of that data sheet on April 5, 2002, the day after the inspection occurred, and that he in turn faxed the data sheet to Eric Taylor at Tweddle, also on April 5.

In May 2002, the portfolios were shipped to Tweddle's distribution facility in Clinton Township, Michigan. Brad Hannah ("Hannah"), vice president of Tweddle, testified in his deposition that Bruce Hill, the production supervisor of the distribution center, told him that Hill felt there was "a quality issue with the Lincoln leather portfolios." Specifically, Hill told him that the embossing of the Lincoln logo was not as deep as "they were used to seeing on the line," and that "there were some crooked embossing of the same image." Subsequently, Taylor, Hannah, and Brian Suszek (also of Tweddle) went to Tweddle's distribution center to examine the portfolios. According to Taylor, they found "that the logos in some cases weren't at the right depth. And in other cases, they were a combination of not the right depth and crooked." Asked what percentage of the portfolios had these problems, Taylor responded that he had no idea. Tweddle initially rejected all the portfolios.

Taylor called Schafer and informed him that there was a "quality issue," and asked him to come to the distribution center. Together, Schafer, Taylor, Suszek, and Andrew Tweddle looked at several portfolios. Schafer did not agree that the portfolios were unacceptable.

5

Tweddle then determined that it would inspect the portfolios using samples of "acceptable product," and "non-acceptable product," as agreed upon by Andrew Tweddle, Suszek, and Taylor. Tweddle's major concerns were with the depth of the embossing of the logo, and any skewing of the logo.

Following this internal inspection, Tweddle agreed to accept 22,000 of the portfolios at the full purchase price of $7.46. Ford Motor Company accepted and paid $11 each for these 22,000 portfolios.

The remaining 28,000 portfolios are in storage in a warehouse owned by Schafer's brother in Wixom, Michigan. Tweddle alleges it was forced to obtain portfolios from The Beanstalk Group at a higher price in order to fulfill its obligations to Lincoln. On August 26, 27, and 28, 2003, Schafer personally inspected all of the Lincoln leather portfolios that were rejected by Tweddle. He found that the embossed Lincoln name and logo was skewed only nineteen of those portfolios

## II. Procedural History

Innovative filed a complaint in the United States District Court for the Eastern District of Michigan on September 12, 2002, alleging that Tweddle had breached its contract with Innovative by refusing to pay Innovative the full contract price for all 50,000 portfolios Innovative supplied to Tweddle. Innovative filed a first amended complaint on November 14, 2002.

On November 19, 2002, Tweddle filed an answer to Innovative's complaint, which asserted that 28,000 of the portfolios supplied by Innovative were rejected as non-conforming. Tweddle also filed a counterclaim, charging that it incurred "cover" damages because it was required to purchase 28,000 portfolios at a price higher than the contract price.

On July 31, 2003, both parties moved for summary judgment. A hearing on the summary judgment motions was held by the district court on October 15, 2003. The same day, the court entered an order denying both parties' motions for summary judgment. In addition, the court found that "Defendant/Counter-Plaintiff Tweddle has waived its breach of contract claim to the extent that it is based on the depth of the embossed log, unless Tweddle can demonstrate that the final portfolios were *more shallow than* the 500 sample portfolios inspected in China."

On December 29, 2003, Innovative again moved for summary judgment, on two grounds. First, Innovative contended that because the 500 sample portfolios inspected in China were not identified, it would be impossible to prove that any of the rejected portfolios had embossing lighter than the sample portfolios. Secondly, Innovative argued that Tweddle had submitted no evidence to create a genuine factual dispute as to the number of rejected portfolios with skewed logos. Because Tweddle had not alleged any defects other than light embossing and skewed logos, Innovative urged the district court to grant summary judgment. That motion was granted by an order of the district court entered on February 24, 2004. Final judgment in favor of Innovative and against Tweddle was entered in the amount of $204,045.92, pre-judgment interest in the amount of $13,401.37, and taxable costs in the amount of $1,694.05, on March 11, 2004.

Tweddle filed a timely notice of appeal to this Court on April 7, 2004.

## DISCUSSION

### I.      Standard of Review

We review a district court's grant of summary judgment *de novo*, using the same standard applied by the district court. *Hamby v. Neel*, 368 F.3d 549, 556 (6th Cir. 2004)(citing *Johnson v.*

*Econ. Dev. Corp.*, 241 F.3d 501, 509 (6th Cir. 2001)). Summary judgment is appropriate when there are no genuine issues of material fact. *Id.*; FED. R. CIV. P. 56(c). In reviewing the district court's grant of summary judgment, we must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576-77 (6th Cir. 2004)(citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)); *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000); *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998).

The moving party initially bears the burden of proving that there is no genuine issue of material fact. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir.1989). This burden can be satisfied by reliance on any of the evidentiary sources listed in Federal Rule of Civil Procedure 56(c) (pleadings, depositions, answers to interrogatories, admissions, and affidavits), or by indicating the failure of the non-moving party to produce evidence creating a genuine issue of material fact. *Id.* at 1478.

If the moving party satisfies this burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party, but . . . must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). If the evidence does not suffice to reasonably support a jury verdict in favor of the non-moving party, the motion for summary judgment will be granted. *Street,* 886 F.2d at 1477; *see also Cox v. Kentucky Dept. of Transp.* 53 F.3d 146, 150 (6th Cir. 1995). "The mere existence of a scintilla of evidence" in support of the non-moving party will not suffice to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

**II.     The district court correctly ruled that Tweddle waived any right to reject the portfolios for light embossing**

As noted above, the district court determined in a pre-judgment order that Tweddle had "waived its breach of contract claim to the extent that it is based on the depth of the embossed logo, unless Tweddle can demonstrate that the final portfolios *were more shallow than* the 500 sample portfolios inspected in China." The district court presumably did so on the basis of evidence that Tweddle was aware that the embossed logo was lighter on the sample portfolios that were inspected in China after production than it was on the sample Tweddle approved before production, and yet permitted shipment of the portfolios to go forward. When Tweddle failed to make the showing required by the district court's order, the district court entered summary judgment in favor of Innovative.

On appeal, Tweddle has inaccurately characterized the district court's disposition of this issue, alleging that the district court determined that Tweddle irrevocably accepted the portfolios in question upon "preliminary inspection in China." As just explained, the district court's grant of summary judgment on this issue was based not on a determination that the inspection in China constituted "irrevocable acceptance" but rather, that Tweddle's awareness of the alleged defect of light embossing prior to shipment constituted a waiver of the right to subsequently reject the portfolios based on that defect. We agree with the district court.

Michigan law states that waiver of a contractual right "may be shown by proof of express language of agreement or inferably established by such declaration, act, and conduct of the party against whom it is claimed as are inconsistent with a purpose to exact strict performance." *Fitzgerald v. Hubert Herman, Inc.*, 179 N.W.2d 252, 254 (Mich. App. 1970) (citing *Strom-Johnson*

9

*Construction Co. v. Riverview Furniture Store*, 198 N.W. 714 (Mich. 1924); *Bissell v. L. W. Edison Co.*, 156 N.W.2d 623 (Mich. App. 1967)).

Uncontradicted evidence presented by Innovative reflected the following facts: Jerry See-Tow, the director of Tweddle's Singapore office, accompanied a representative of Bureau Veritas hired by Tweddle, to an inspection of portfolios produced for Tweddle in China at the Palibon production plant. See-Tow indicated to the president of Palibon that the portfolios were suitable for shipment and that no further inspection was necessary. Furthermore, in an inspection report provided by Bureau Veritas to See-Tow prior to shipment, it was clearly indicated that "[t]he hot stamping of 'Lincoln' logo was not as deep as that against the client's approved sample," yet the shipment was considered in conformance nonetheless. This information was also included in an inspection data sheet made available to Eric Taylor, Tweddle's purchasing agent, prior to shipment.

Tweddle's conduct in indicating that the portfolios were suitable for shipment and in instructing Palibon to ship the order, despite knowing that the embossing was lighter than on the approved sample, is inconsistent with a purpose to exact strict performance with respect to the depth of the embossing. We therefore affirm the district court's determination that Tweddle waived its right to reject the portfolios on the ground that the embossing was lighter than on the approved samples.

III.    **The district court correctly ruled that only nineteen of the portfolios could be rejected for skewed embossing**

The only other defect alleged by Tweddle as justification for the rejection of the portfolios is that the embossed Lincoln name and logo was skewed on some of the portfolios. With respect

to that issue, Innovative presented the affidavit of David Schafer, who testified that over the course of three days in August, 2003, he personally inspected all of the 28,000 portfolios rejected by Tweddle, and found that only nineteen of them were "slightly crooked" and non-conforming.[1]

Tweddle presented the affidavit of Eric Taylor, who testified that, also in August 2003, he spent "less than an hour" going through some of the hundreds of boxes of rejected portfolios. Based on "the limited sampling [he] conducted," Taylor noted that some of the boxes (which each contained thirty portfolios) contained no portfolios with skewed logos, while others had more than one. He "would estimate that there was one skewed logo per box or two," and would "conservatively estimate there are more than 500 skewed logos." He noted, though, that "he would have to conduct a complete count of 28,000 portfolios to arrive at an exact number."

Taylor's affidavit is far too speculative to satisfy Tweddle's burden of responding to Innovative's motion for summary judgment, which was supported with specific evidence. Federal Rule of Civil Procedure 56(e) requires that in responding to a well-supported motion for summary judgment, an adverse party "must set forth specific facts showing that there is a genuine issue for trial." Tweddle presented no "specific facts" but instead only the rough estimates offered in Taylor's affidavit. "[T]his circuit has long held that '[m]ere conclusory and unsupported allegations, rooted in speculation, do not meet [the] burden'" of demonstrating that there is a genuine issue for

---

[1]Incredibly, Tweddle entirely ignores this affidavit and repeatedly insists on relying on Schafer's deposition testimony, which pre-dated his inspection of August 2003, to assert that Schaffer has never inspected the portfolios and that Innovative has no evidence that the portfolios are conforming.

trial. *Bell v. Ohio State University* 351 F.3d 240, 253 (6th Cir. 2003) (quoting *Bryant v. Commonwealth of Kentucky,* 490 F.2d 1273, 1274 (6th Cir.1974) (per curiam)).

We conclude that the district court appropriately determined that without other, reliable evidence, Tweddle had failed to demonstrate that there was a genuine issue of material fact as to whether more than nineteen of the portfolios were skewed. In the absence of evidence of non-conformance as to the remaining portfolios, there was, furthermore, no issue of material fact as to whether Tweddle breached its contract by refusing to pay for them, and the district court appropriately entered summary judgment against Tweddle.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.